**CALDERONE ENTERPRISES COR-PORATION, Plaintiff-Appellant,**

v.

**UNITED ARTISTS THEATRE CIRCUIT, INC., et al., Defendants-Appellees.**

**No. 293, Docket 71–1713.**

United States Court of Appeals, Second Circuit.

Argued Nov. 11, 1971.

Decided Dec. 28, 1971.

Jacoby, New York City, for appellee Columbia Pictures Industries, Inc.; Phillips, Nizer, Benjamin, Krim & Ballon, New York City (George Berger, New York City, of counsel), for appellee United Artists Corp.; Stroock & Stroock & Lavan, New York City (Laurence Greenwald, Bernard R. Sorkin, New York City, of counsel), for appellee Warner Bros., Inc., sued herein as Warner Bros.-Seven Arts, Inc.; Royall, Koegel & Wells, New York City (Herbert C. Earnshaw, New York City, of counsel), for appellee Twentieth Century-Fox Film Corp.; Booth, Lipton & Lipton, New York City (Donald S. Engel, New York City, of counsel), for appellee National General Pictures Corp.; E. Compton Timberlake, New York City (Walter J. Josiah, Jr., New York City, of counsel), for appellee Paramount Pictures Corp.; Davis Polk & Wardwell, New York City (Henry L. King, William H. Levit, Jr., New York City, of counsel), for appellee Metro-Goldwyn-Mayer, Inc.), for distributors-appellees.

Bernard W. Nussbaum, New York City (Wachtell, Lipton, Rosen & Katz, New York City, for appellees United Artists Theatre Circuit, Inc., Metropolitan Playhouses, Inc. and United Artists Eastern Theatres, Inc.), for exhibitors-appellees.

Before KAUFMAN and MANSFIELD, Circuit Judges, and LEVET, District Judge.*

MANSFIELD, Circuit Judge:

This appeal raises once again the question whether one who is not a "target" of an alleged antitrust conspiracy has standing under § 4 of the Clayton Act, 15 U.S.C. § 15, to sue for treble the amount of damages suffered by it incidentally. In this case, suit is brought by a non-operating landlord of theatres allegedly used by its tenant and various motion picture distributors and exhibitors in furtherance of an antitrust conspiracy to restrain the trade of competing distributors and exhibitors. We

David B. Bernfeld, New York City (Herbert Schrank, Goldstein & Schrank, New York City, on the brief), for plaintiff-appellant.

John L. Amabile, New York City (Schwartz, Mermelstein, Burns, Lesser &

* Of the United States District Court for the Southern District of New York, sitting by designation.

adhere to our prior decisions on the issue, see Fields Productions, Inc. v. United Artists Corp., 432 F.2d 1010 (2d Cir. 1970), affirming, 318 F.Supp. 87 (S.D. N.Y.1969), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971); Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 877, rehearing denied, 401 U.S. 1014, 91 S.Ct. 1250, 28 L.Ed.2d 553 (1971); S.C.M. Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461, rehearing denied, 396 U.S. 869, 90 S.Ct. 38, 24 L.Ed. 2d 125 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956), and affirm the district court's dismissal of the complaint.

The action arises out of plaintiff's lease of three theatres located in Nassau County, New York (the Calderone, Rivoli and Cove) to defendant Metropolitan Playhouses, Inc., which, along with defendant United Artists Eastern Theatres, Inc., is a subsidiary of defendant United Artists Theatre Circuit, Inc. (all three of which are referred to collectively as UATC), for operation as motion picture theatres by UATC. The remaining defendants are engaged in the distribution of motion pictures to theatres throughout the United States, including those operated by UATC.

Invoking federal jurisdiction pursuant to the federal antitrust laws, plaintiff on April 16, 1970, filed its complaint containing six claims, the first three of which seek more than $7 million treble damages from all defendants, based upon their participation in an alleged antitrust conspiracy to restrain trade in the distribution and exhibition of motion pictures. The last three claims, predicated on pendent jurisdiction, seek $2,-350,815 damages against UATC for breach of its lease of the three theatres. Each of the first three claims of the complaint alleges that plaintiff's predecessor leased one of the three theatres (the Calderone, Rivoli, or Cove), a high quality, first-class house, to UATC for an annual fixed minimum rental, plus an additional rental based upon a percentage of gross receipts realized annually from exhibition of motion pictures, the term of the lease being later extended to May 7, 1971. Plaintiff, as the landlord of the three theatres, did not reserve any right to participate in the operations or management of them. It alleges that the defendant-distributors, pursuant to a conspiracy with UATC and other motion picture theatre operators in violation of the federal antitrust laws, established a system of distributing motion pictures in the New York Metropolitan area called "Showcase." Under "Showcase" UATC and other exhibitors did not compete against one another for licenses from distributors to exhibit motion pictures on a first neighborhood run basis. Instead they divided all theatres suitable for such runs into groups known as "tracks" and allocated motion pictures for first neighborhood runs among the different "tracks." In the absence of such an arrangement, plaintiff alleges, better quality theatres such as the three leased by plaintiff to UATC would on a competitive basis exhibit pictures having the greatest box office appeal, thus realizing higher gross receipts than from less popular pictures. Under "Showcase," however, it is alleged that each of the three theatres was obligated to exhibit all features assigned to that theatre's "track," including inferior pictures that would not have been exhibited under normal competitive conditions, with the result that plaintiff's percentage of rental income was substantially less than it otherwise would have been and the market value of its fee interest in the theatres has been impaired. Plaintiff seeks treble the amount of the alleged loss in income and in value of the theatres.

The last three claims of the complaint seek single damages against the UATC defendants based on the charge that their exhibition of pictures in the three theatres pursuant to "Showcase" constituted a breach of their duty under the

leases to refrain from willful acts which would have the effect of reducing gross receipts and percentage rentals of the three theatres.

The district court granted defendants' motion, pursuant to Rule 12(b) (6), F.R. Civ.P., to dismiss the first three counts on the ground that as a non-operating landlord of a motion picture theatre, plaintiff did not have standing under § 4 of the Clayton Act to recover damages allegedly caused by a combination of motion picture distributors and theatre operators to restrain trade in the exhibition of motion pictures in violation of the federal antitrust laws. Accordingly the three pendent state claims were also dismissed pursuant to the teaching of United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); see also O'Neill v. Maytag, 339 F.2d 764, 766 n. 3 (2d Cir. 1964).

In a series of decisions over the last 15 years, in all of which certiorari was denied by the Supreme Court, this court has committed itself to the principle that in order to have "standing" to sue for treble damages under § 4 of the Clayton Act, a person must be within the "target area" of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued. Accordingly we have drawn a line excluding those who have suffered economic damage by virtue of their relationships with "targets" or with participants in an alleged antitrust conspiracy, rather than by being "targets" themselves. For example, standing has been denied to a patent owner claiming derivative harm as the result of a conspiracy directed against its licensees, Productive Inventions, Inc. v. Trico Products Corp., *supra;* S.C.M. Corp. v. Radio Corp. of America, *supra,* a franchisor complaining of an antitrust combination directed at its franchisee, Billy Baxter, Inc. v. Coca-Cola Company, *supra,* and a motion picture producer seeking damages from its television distributor based upon the latter's distribution of films by "block booking" the films with a view to restraining the trade of television stations and other distributors but not producers, Fields Productions, Inc. v. United Artists Corp., *supra.*

The rationale behind the foregoing demarcation is simple, fair and reasonable. It respects the purpose of § 4 of the Clayton Act, which is to provide a private enforcement weapon that will deter violation of the federal antitrust laws by permitting any person injured in his business by reason of an antitrust violation to recover treble the damages actually suffered. It acknowledges that while many remotely situated persons may suffer damage in some degree as the result of an antitrust violation, their damage is usually much more speculative and difficult to prove than that of a competitor who is an immediate victim of the violation. Furthermore if the flood-gates were opened to permit treble damage suits by every creditor, stockholder, employee, subcontractor, or supplier of goods and services that might be affected, the lure of a treble recovery, implemented by the availability of the class suit as facilitated by the amendment of Rule 23 F.R.C.P., would result in an over-kill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress. If the antitrust laws were precise and crystallized something might be said in favor of such an enormous expansion of potential treble damage liability, speculative as the damages might be. But the fact remains that because there are few "bright lines" in the area, even experts who have devoted their entire professional lives to the practice of antitrust law often find it impossible to advise a client with any degree of certainty whether his contemplated conduct will transgress lawful bounds.[1]

---

1. See Austern, Dealing With Uncertainties in How to Comply With the Antitrust Laws 367–68 (Van Cise & Dunn, eds. 1954) ("By this time, perhaps, an abiding sympathy may have been enlisted for those lawyers who must advise in this

 Accordingly it is necessary to use a rule of reason in construing the requirements of § 4 of the Clayton Act as to standing, just as such a rule has been adopted by courts in determining whether restraints, other than *per se* violations, trangress §§ 1 and 2 of the Sherman Act. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). A line which limits standing to those against whom the antitrust violation is directed fulfills Congress' fundamental purpose and at the same time establishes a reasonable and easily identifiable cutoff that avoids the unfortunate consequences of opening the flood-gate to all, no matter how remote their interest or incidental their relationship.[2] Competitors who are within the target area of an alleged antitrust conspiracy usually have more incentive than others to avail themselves of § 4. In those cases where they fail to do so, the Government may, of course, seek injunctive or punitive relief under other sections of the antitrust laws. See, *e. g.*, 15 U.S.C. §§ 1, 2, 4, 9.

 Applying these established principles here, plaintiff, a non-operating landlord of a theatre leased to an exhibitor, is clearly outside of the target area of the alleged conspiracy of distributors and exhibitors, which was to restrain competition in the exhibition of motion pictures. The alleged conspracy was admittedly not aimed at plaintiff, but at competing distributors and exhibitors.[3] Nor does the fact that the plaintiff's lessee was allegedly a party to the conspiracy materially distinguish this case from those where standing has been denied to one having a similar relationship to an innocent competitor victimized by a conspiracy, *e. g.*, Billy Baxter, Inc. v. Coca-Cola Company, *supra*; S. C. M. Corp. v. Radio Corp. of America, *supra*. Indeed, we have reecently denied standing to one suing on the basis of a contract with a co-conspirator. Fields Productions, Inc. v. United Artists Corp., *supra*. In determining whether a plaintiff has standing under § 4 of the Clayton Act, the only relevant factor is whether the plaintiff is a "target" of the illegal activity. If the plaintiff is not within the "target area," then it is legally immaterial whether the person through whom the plaintiff derives his injury was a member of the conspiracy or was innocent of any wrongdoing. A plaintiff not a target of any antitrust violation does not become a target by virtue of the culpability of its lessee, patentee, franchisee, supplier, customer, or debtor.[4]

---

field. Even the most uncharitable should commiserate with the businessman who seeks to obtain definitive working rules for his daily operations.")

2. Despite our dissenting brother's suggestion that the "target area" standard is vague and confusing, we find it to possess the virtue of definiteness. In simple terms a "target" is a person or business against which competitive aim is taken. The line is clearly drawn by requiring that to have standing one must be an object of an antitrust conspiracy. In contrast, the "foreseeability" test urged by the dissent would permit anyone to sue, regardless of how distant his interest or relationship (including a customer of a competitor's customer, or a supplier to a supplier dealing with an alleged conspirator), since it would be difficult to disprove the fact that remote economic repercussions in the line of distribution result from almost every antitrust violation.

3. We do not suggest that a non-operating theater lessor may never have standing to sue for treble damages under § 4 of the Clayton Act. If Calderone had alleged, for example, that the defendants had aimed their conspiracy at it, such as by agreeing to distribute and exhibit profitable pictures at theaters owned by the defendants or with which they had flat-lease arrangements, and not to distribute them to theaters with which they had percentage leases, Calderone would be in a different posture.

4. The dissent does not feel itself bound by the previous decisions of this Circuit mentioned above, because it views each of these decisions as distinguishable from the present case. We fail to find any legal significance in the factual differences described at some length by Judge Levet. Indeed, even the dissenting judges in two of the cases (*S.C.M. Corp. and Billy Baxter, Inc.*) indicated that their disagree-

Although Calderone does not have standing under § 4 of the Clayton Act, nothing precludes a distributor or exhibitor against whom the alleged conspiracy is directed from bringing a treble damage suit against defendants, and we have been advised that such actions by non-participating exhibitors are now pending in the United States District Court for the Southern District of New York. See, e. g., Glen Cove Theatre, Inc. v. United Artists Corp., 66 Civ. 661.

We see no legally significant difference between plaintiff's position and that of the franchisor in Billy Baxter, Inc. v. Coca-Cola Company, supra, and the motion picture producer in Fields Productions, Inc. v. United Artists Corp., supra, both of whom were denied standing. Indeed respected courts have held that a non-operating landlord lacks standing to seek treble damages from its tenant and others for alleged antitrust violations which decreased its theatre rentals. See, e. g., Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L. Ed.2d 85 (1956), motion for leave to file petition for rehearing denied, 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 198 (1957); Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312 (E.D.Pa.1953), affd., 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954); Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., 193 F.Supp. 401 (S.D.N.Y.1961); Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685 (S.D.N.Y.1963), affd. on other grounds, 332 F.2d 269 (2d Cir. 1964). We are not

persuaded by the contrary decision of the Seventh Circuit in Congress Building Corp. v. Loew's Inc., 246 F.2d 587 (7th Cir. 1957), the soundness of which has been questioned by Judge Hastings of that court. See Sandidge v. Rogers, 256 F.2d 269, 278 (7th Cir. 1958). The Ninth Circuit's decision in Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir. 1956), is clearly distinguishable from the present case for the reason that the plaintiff-landlord there alleged that her tenant and various motion picture distributors had conspired to destroy the value of plaintiff's theatre by threatening to withhold first-run motion pictures from it unless plaintiff agreed to reduce the fixed monthly rental and to grant options to renew the lease, which plaintiff was forced to do. Plaintiff there was thus a target of the alleged conspiracy.[5] No such allegation is made in the present case.

Our decision does not leave the plaintiff here without a remedy. Assuming plaintiff's claims to be meritorious, it is not precluded from recovering single damages from UATC in a state court suit for breach of terms of the lease, which forms the basis of the three pendent claims asserted in the present action. Since the federally-based claims were properly dismissed prior to trial, however, the pendent state claims must also be dismissed and the plaintiff relegated to the state courts for relief. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); O'Neill v. Maytag, 339 F.2d 764, 766 n. 3 (2d Cir. 1964).

ments centered upon not whether the precedents were factually distinguishable from the case before them, but whether a different test should be applied.

Nor does the dissent provide any rationale in support of a differentiation based upon whether a plaintiff's relationship was with a victim of the conspiracy or with one in pari delicto. Indeed, by denying standing in the latter situation in Fields Productions, Inc., supra, we failed to see the relevance of such a distinction. Moreover, we do not agree that Calderone, rather than its lessee-exhibitor, is in an

analogous situation to the television stations in Fields Productions, Inc., who were exhibitors of the motion pictures subjected to block booking.

5. In addition, the test employed here is consistent with that of later Ninth Circuit decisions. In Hoopes v. Union Oil Co. of California, 374 F.2d 480, 485 (9th Cir. 1967), and Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073, 1076 (9th Cir. 1970), the court found the plaintiff to be within the "target area" of the antitrust violation.

LEVET, District Judge (dissenting):

I dissent and vote to reverse the determination of the District Court.

The issue presented in this appeal is whether appellant, Calderone Enterprises Corporation (hereinafter "Calderone"), an owner-lessor of motion picture theatres under a percentage lease agreement, has standing to sue its lessee, defendant, United Artists Theatre Circuit, Inc. (hereinafter "UATC"), and other alleged co-conspirators for antitrust violations under Section 4 of the Clayton Act, 15 U.S.C. § 15, which resulted in substantial financial damage to the appellant in terms of: (a) reduction in the amount of percentage rental received by appellant from its lessee; and (b) damage to appellant's reversionary and fee interest in the form of a present decline in the market value of the theatre.

In the majority opinion it is asserted that this question has been answered in the negative by the Second Circuit. I am forced to disagree with that conclusion. The issue has never been determined by this Court and the appellant does have standing to sue in this action.

I accept the facts in this case as recited in the majority opinion. In any event, since this action was appealed as a result of the granting of defendants' motion to dismiss for failure to state a claim upon which relief could be granted, pursuant to Rule 12(b) (6) Fed.R.Civ.P., I must assume that all the facts in the complaint are correct.

## I. *Standing to Sue*

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides in pertinent part:

"That any person who shall be *injured* in his *business or property by reason of* anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold of the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." (Emphasis added.)

Any natural or artificial person, *i. e.,* corporation, organization or association, can bring an action under this section.

However, there are three prerequisites for recovery. First, there must be in fact an injury. Plaintiff must plead with specificity the nature, character, and extent of his injury. Second, the injury complained of must be against plaintiff's business or property. Third, the injury must be proximately caused by the alleged violation, *i. e.,* the plaintiff must show some causal connection between his injury and the illegal acts of the defendant.

Under this statutory scheme Calderone has standing to sue. Plaintiff has alleged an injury to his business and property resulting from an antitrust violation. However, judicial interpretation and application of the statute has imposed an additional requirement. It is no longer sufficient that a plaintiff establish merely that he was "injured" in his "business and property" "by reason of" an antitrust violation. Now, in order to satisfy the statute, a plaintiff must demonstrate that his loss was a result of a direct injury to him by the defendant or that he was within the "target area" of the violation.

This whole notion of directness was first enunciated in the 1910 case of Loeb v. Eastman Kodak Co., 183 F. 704 (3rd Cir. 1910). In *Loeb* plaintiff, a shareholder and creditor of the corporation, which was forced out of business by defendant's antitrust violations, brought an action under Section 7 of the Sherman Anti-Trust Act of 1890. The court reasoned that the injury complained of was directed at the corporation and not at the individual stockholders. The only relief, therefore, the plaintiff could obtain would be through a derivative suit in the name of the corporation. However, the individual stockholder in that case was bringing an action in his own right. Hence, the court termed the injury to the stockholder as "indirect," "remote," and "consequential" and denied the plaintiff standing to sue.

The underlying reasoning of the court in the *Loeb* case seemed to be the fear of possible multiplicity of actions brought by plaintiff-creditors of the cor-

poration if it were to permit the plaintiff in this situation to maintain an action. The court said:

"There must exist some barrier which will effectually prevent such a multiplicity of suits as the plaintiff's position suggests, and we believe not only that that barrier exists, but that it is found now just where it was prior to the passage of the act in question." Loeb v. Eastman Kodak Co., *supra*, at 709.

The type of "privity" approach which the courts have attempted to create with the directness requirement in the corporate cases, such as in *Loeb*, has been extended into other areas and a number of Second Circuit decisions have examined this question. For example, in alleged antitrust violations where the plaintiff suffers losses and injuries resulting from a diminution of profitable relations, some courts still hold that the plaintiff has no cause of action. Fields Productions, Inc. v. United Artists Corp., 432 F.2d 1010 (2d Cir. 1970), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971). Also, the courts have generally denied a patentee and a franchisee standing to sue for alleged loss of profits or royalties as a result of injury caused to its licensee by dealings entered into by a competitor. S. C. M. Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461, rehearing denied, 396 U.S. 869, 90 S.Ct. 38, 24 L.Ed.2d 125 (1969); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 877, rehearing denied, 401 U.S. 1014, 91 S.Ct. 1250, 28 L.Ed.2d 553 (1971).

Another area that this "privity" doctrine has invaded is in the landlord-tenant situation. However, here the courts have made a clear distinction between lessees who participated in the illegal activities and those who were merely innocent victims. *See* Note, Standing to Sue for Treble Damages Under Section 4 of the Clayton Act, 64 Colum.L.Rev. 570, 583 (1964). In Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957), the court said that the plaintiff, a nonoperating owner-lessor, whose lease of motion pircture theatre property entitled it to a fixed minimum rental plus a percentage of the lessee's gross receipts, could maintain a private antitrust suit to recover treble damages for injuries alleged to have been sustained as a result of a conspiracy by lessees with certain motion picture distributors and affiliated exhibitors to relegate its theatre to an inferior exhibiting position. Plaintiff thus was deprived of rentals under the percentage clause that it otherwise would have received. The court ruled that the injury was direct because the lessee had actively participated in the illegal conspiracy. In this case the Seventh Circuit demonstrated an appropriate flexibility in the application of the standing requirements of the antitrust laws. *See* Note, The Franchisor as Plaintiff in Treble Damage Actions: An Antitrust Anomaly, 49 B.U.L.Rev. 322, 327–329 (1969).

The rationale in the Congress Building Corp. case was specifically adopted in Erone Corp. v. Skouras Theatres Corp., 166 F.Supp. 621 (S.D.N.Y.1957). There the court held that the plaintiff had standing to maintain a suit against the lessees of the theatres who were participants in the illegal conspiracy to violate the antitrust laws, but against the lessees who were merely victims, there was no cause of action. Furthermore, in an earlier Southern District of New York case, Camrel Co., Inc. v. Paramount Film Distributing Corp., et al., CCH Trade Cas. ¶ 57, 233 (S.D.N.Y.1944), the court in a very similar factual situation proposed the exact rationale that the *Congress* and *Erone* cases followed.

The rationale developed in *Congress* is clearly applicable here. In this case we have a nonoperating owner-lessor who has suffered substantial direct injury by the participation of his lessee and other distributors in antitrust violations. Un-

der the *Congress* formula, plaintiff Calderone has standing to sue.

The directness doctrine has not been universally adopted by the courts and another or alternative judicial requirement, the "target area" test, has evolved. This approach focuses on whether the person injured by the antitrust violation was aimed at and hit by the illegal activity. In other words, under this test the plaintiff must demonstrate that he was within the area of the economy endangered by the competitive breakdown. This approach was first proposed in Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). The court said:

> ". . . [i]n order to state a cause of action under the anti trust laws a plaintiff must show . . . that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." Conference of Studio Unions v. Loew's, Inc., *supra*, 193 F.2d at 54–55.

The "target area" test was more clearly articulated in Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955). In *Karseal* the defendant, a distributor of car wax, had entered illegal exclusive-dealing contracts with service station retailers, causing them to cease purchasing from plaintiff's distributors the brand of car wax manufactured by plaintiff. The court held that the manufacturer had standing to sue the defendant distributor, even though the distributor and the manufacturer were from different classes of competitors (*i. e.,* they did not compete at the same market level) and even though the manufacturer's own distributors were the immediate parties injured. Since the defendant's violation was aimed at impeding the sale of competitive products and was directed against the manufacturers and distributors of such products, the court concluded that the competing manufacturers, distributors and producers all were the target of the illegal practices. *See, e. g.,* Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir. 1966); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

Recently, some courts, especially in the Ninth Circuit, have developed a more flexible definition of the term "target area" and have directed the test towards a question of foreseeability, *i. e.,* whether plaintiff would be in the reasonably foreseeable area to be affected by the antitrust violations. Initially articulated in Twentieth Century-Fox Film Corp. v. Goldwyn, 328 F.2d 190, 220 (9th Cir. 1964), the Ninth Circuit applied this test in Hoopes v. Union Oil Company of California, 374 F.2d 480 (9th Cir. 1967). In *Hoopes* the court held that an owner of a service station had standing to attack illegal restraints upon his conditional vendee, successive lessees, and potential lessees. The defendant's allegedly illegal conduct was "aimed" at restricting the use of appellants' property. "Appellants and their property were within the 'target area' of that conduct—'the area which it could reasonably be foreseen would be affected' by the antitrust violations." *Id.* at 485. The foreseeability test appeared to the court to be more consistent with the purposes of the statute. *See generally* Alioto and Donnici, Standing Requirements for Antitrust Plaintiffs in Judicially Created Exceptions to a Clear Statutory Policy, 4 U.S.Fran.L. Rev. 205, 212–214 (1970).

The latest determination by the Ninth Circuit on this subject squarely affirmed the *Hoopes* articulation of the foreseeability test. In Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073 (9th Cir. 1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971), the court held that the plaintiff had standing to sue where the defendant distributor block-booked plaintiff's films thereby causing him to earn less profit on his percentage-of-net-receipts arrangement with the defendant. The court accepted the findings of the district court that Mulvey was neither a supplier of motion

pictures to television nor a customer in the market for such pictures, that defendant Goldwyn's acts of licensing were aimed at television stations and therefore Mulvey was not within the area of the economy endangered by a breakdown of competitive conditions. However, the court, despite the lower court's findings, unequivocally applied the *Hoopes* test and found that Mulvey, the plaintiff, was a reasonably foreseeable victim of such illegal activities and, thus, must be afforded standing to sue. The court said:

> "But Mulvey was 'hit' as squarely as were *Karseal* and *Hoopes:* He was neither sideswiped nor struck by a carom shot. He was within the area 'which it could reasonably be foreseen would be affected' by block booking." Mulvey v. Samuel Goldwyn Productions, *supra*, 433 F.2d at 1076. (Emphasis added.)

Calderone should be allowed to recover under the "target area" test. In this present action defendant UATC participated in a system ("Showcase system") of distribution and exhibition of motion pictures that deprived appellant's theatres and all high quality theatres of bidding for better films, thus, reducing substantially the amount of profit of the better theatres. Under the test formulated by *Conference of Studio Unions* and *Karseal* and expanded in *Hoopes* and *Mulvey,* the area of the economy which was being endangered by the breakdown of competitive conditions was the position of all those who stood to gain financially from the showing of better films in these theatres. Calderone was substantially hit by defendant's illegal conduct and it was reasonably foreseeable that Calderone would be affected by such antitrust violations.

In testing Calderone's standing to sue, we must also consider the more basic questions of the purpose of Section 4 of the Clayton Act and consequently the reasonableness of the judicial requirements of directness and the "target area" test.

The purposes of Section 4 of the Clayton Act are not only to enforce the anti-

trust laws, but also to deter antitrust violations by reason of possible private treble damage suits and to protect and compensate those who are injured by such misconduct, as was Calderone here. *See, e. g.,* Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 336, 340, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 502, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Perma Life Mufflers Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1946).

Restrictions on application of the treble damage remedy seem clearly repugnant to the language of the statute and to the repeated pronouncements of the United States Supreme Court. The Supreme Court has constantly recognized that antitrust laws should be given the broadest and most liberal interpretation in order to effectuate Congressional intent. *See, e. g.,* Radiant Burners, Inc. v. Peoples Gas, Light, & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Radovich v. National Football League, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 265–266, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The Court has consistently rejected judicial attempts to impose additional restrictions on standing under antitrust statutes. In *Radovich, supra,* the court said:

> "Petitioner's claim need only be 'tested under the Sherman Act's general prohibition of unreasonable restraints of trade' . . . and meet the requirement that petitioner has thereby suffered injury. Congress has, by legis-

lative fiat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the antitrust laws to an aggrieved party. These laws protect the victims of the forbidden practice as well as the public. . . . *In the face of such a policy, this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in the laws."* Radovich v. National Football League, *supra,* 352 U.S. at 453–454, 77 S.Ct. at 395.

The Supreme Court has never accepted the "target area," "indirect injury" or "proximate cause" limitations on plaintiffs' right to claim relief under antitrust violations. *See* Alioto and Donnici, Standing Requirements for Antitrust Plaintiffs in Judicially Created Exceptions to a Clear Statutory Policy, 4 U.S. Fran.L.Rev. 205, 211 (1970). The editors of the Columbia Law Review have expressed a similar view in regard to the purposes of Section 4:

"Its purpose is so broad and its mandate so clear that any person who can show damage prima facie should be within the protected class. . . . In view of the section's broad language and purpose, the presumption should be in favor of the plaintiff's right of action, absent a showing that to allow his claim would be contrary to congressional intent." 64 Colum.L.Rev. 570, 587 (1964).

Unfortunately, lower federal courts have demonstrated at times a tendency to be more concerned with the possibility of a windfall recovery under the treble damage provision than with Congress' established intention to *encourage* private treble damage suits as an *enforcement* of the antitrust laws. Courts must consider first the basic purpose of the statute and the uninterrupted line of Supreme Court decisions upholding that position. If lines of demarcation, limitations or restrictions are to be drawn and imposed on the statute, that is for the legislative branch to do and not for this court.

Therefore, the imposition of restrictive judicial requirements on the statute is questionable. First, the soundness of the directness doctrine is dubious. Formulated in the early part of the nineteenth century when the concept of privity dominated almost any kind of recovery, the reasonableness of this judicially constituted requirement coupled with the purpose of Section 4 of the Clayton Act should be reexamined. Judge Waterman in Billy Baxter, Inc. v. Coca-Cola Company, *supra,* vigorously dissented and challenged the directness requirement. His arguments are persuasive and I will further elaborate on them.

It seems anomalous that when a plaintiff suffers injury from defendant's illegal antitrust activity, even though plaintiff is not in privity with and separated from the defendant by means of an intermediary who is a victim or participant in the misconduct, that the plaintiff may be foreclosed from recovery because his injury is labeled "indirect," "remote," or "consequential." By classifying the injury as such, the plaintiff is precluded from recovery regardless of the extent or nature of the plaintiff's loss. Thus, some courts have taken the approach that when the business and property interests of such plaintiffs are injured because of injuries to the competitive market of persons with whom they are connected, then the plaintiff's position to the defendants is labeled "indirect." Responding to that position of certain courts, Judge Waterman said:

". . . [i]n deciding whether a plaintiff has standing to pursue the federally created cause of action codified in 15 U.S.C. § 15 it seems to me that perhaps the use by courts in antitrust opinions of inherited decisional labels may have obfuscated the positions of some plaintiffs so as to have denied them the recoveries which fact-analysis might have indicated they should have obtained." Billy Baxter, Inc. v. Coca-Cola Company, *supra,* 431 F.2d at 191.

Second, the "target area" test is a conceptual limitation, and at times vague,

confusing and inconsistently applied. For example, in Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies, 382 F.2d 925 (10th Cir. 1967), the court refused to apply the "target area" test on the ground that the "target area" was in fact the same as the direct-indirect test but just given a different name. The court said, "we need not seek new language to express the same doctrine." *Id.* at 928.

The "target area" test seems no more capable than the directness doctrine of vindicating public policy. It still operates to prohibit plaintiffs from suing by applying labels, rather than trying to examine the economic relationships of prospective plaintiffs to the antitrust violations. Although the "target area" approach attempted to remedy the defects of the directness doctrine that Judge Waterman mentioned, it is a far cry from the panacea envisioned. By narrowly construing the so-called "target area," as some courts have done, without taking into account the basic policy considerations, continued denigration is done to the statute. For instance, when there is a knowing and wilful antitrust violation directed against a competitive market with entirely foreseeable consequences to a business dealing within the market, the injured party should be afforded standing to sue. *See* Comment, Franchisor Standing to Sue in Treble Damage Actions, 119 U.Pa.L.Rev. 696, 702–703 (1971). In other words, the "target area" should encompass the foreseeable totality of competitive injury and not, as some courts have interpreted, simply one level of distribution of the product where the injury occurred. When a plaintiff chooses to receive from its licensee, distributor or lessee a precentage-of-gross-receipts arrangement, rather than a fixed sum, it has become intimately interwoven into the competitive market and no longer a bystander. Here, the plaintiff deserves compensation whenever the violator illegally forces the market to reduce its profit, no matter at which stage or level in the marketing

process the violation occurs. *See* Note, 45 Tul.L.Rev. 1031, 1035–1037 (1971).

Antitrust regulations are not always paragons of clarity and both judicial requirements of directness and the "target area" test have frequently been imprecisely defined and applied. Therefore, in any violation under Section 4 of the Clayton Act, one must look mainly at the underlying policy considerations and at the particular facts and circumstances of the case. And if the district and circuit courts persist in employing labels like the directness and "target area" tests, then these requirements should be applied broadly and liberally, as in *Mulvey,* in order to fulfill the fundamental purpose of the antitrust laws. *See, e. g.,* 40 U.Cin.L.Rev. 129, 133–135 (1971); 19 Case W.Res.L.Rev. 132, 137–138 (1967).

## II. *Second Circuit Decisions*

The majority opinion contends that prior decisions in the Second Circuit. support the lower court ruling here that appellant has failed to state a claim for relief under the antitrust laws and it is incumbent on this court to follow that precedent. I disagree.

The issue now presented is essentially different from previous determinations in this circuit. Here, the appellant, an owner-lessor of motion picture theatres under a percentage lease agreement alleges that its lessee and other individuals conspired to violate the antitrust laws causing substantial financial damage to the appellant. The cases cited that supposedly preclude recovery are the following: Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); S. C. M. Corp. v. Radio Corporation of America, 407 F.2d 166 (2d Cir.), cert. denied; 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461, rehearing denied, 396 U.S. 869, 90 S.Ct. 38, 24 L.Ed.2d 125 (1969); Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 877, rehearing denied, 401 U.S. 1014, 91 S.Ct. 1250, 28 L.Ed.2d 553 (1971); Fields

Productions, Inc. v. United Artists Corp., 432 F.2d 1010 (2d Cir. 1970), affirming, 318 F.Supp. 87 (S.D.N.Y.1969), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed. 2d 232 (1971); Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685 (S.D.N.Y.1963), aff'd on other grounds, 332 F.2d 269 (2d Cir. 1964). I will analyze each of these cases to demonstrate that they are not controlling here and that they have not considered this particular question.

In Productive Inventions v. Trico Products Corp., *supra*, the owner of a patent brought an action against its licensees-competitors, causing harm to said licensees, and, in turn, damaging plaintiff because of reduced royalties. The court concluded that the wrongful acts were not directed against plaintiff-licensor but against its licensees and, hence, that plaintiff lacked standing to sue. This case is unlike ours in that there defendant-licensee was an innocent party and not a participant in the antitrust violations. Moreover, the court limited that decision to the facts of the case by saying:

> "No hard and fast rule can be laid down in these situations as the line between direct and incidental damage is not always definable with clarity. All we here determine is that under the facts pleaded appellant has no right to recover treble damages." Productive Inventions v. Trico Products Corp., *supra*, 224 F.2d at 680.

Furthermore, the *Productive Inventions case,* in seeming to restrict the concept of treble damages, is in apparent conflict with the purpose of the statute and the Supreme Court pronouncements, besides being the subject of much criticism. *See, e. g.*, 69 Harv.L.Rev. 575, 576 (1956); SCM Corp. v. Radio Corporation of America, 2 Cir., 407 F.2d 166, 172–173 (1969) (Judge Timbers dissenting).

S. C. M. Corp. v. Radio Corporation of America, *supra*, like *Productive Inventions,* involved an owner of a patent bringing an action against competitors of its licensees for antitrust violations.

In *S. C. M.* RCA alleged a counterclaim based on allegations that S. C. M. sold Electrofax machines on the unlawful condition that purchasers would not buy or use goods of an S. C. M. competitor in violation of the Clayton Act. RCA also claimed that S. C. M. lured and induced breach of contract by the personnel of its prospective competitors and licensees, and complained of diminished royalties which resulted in injury. Judge McLean, in the court below, decided that there was no direct injury to RCA because the injuries suffered were by 63 licensees and, hence, RCA had no standing to sue.

Judge Moore in the Court of Appeals seems to have agreed with Judge McLean that RCA's injuries in loss of royalties and litigation expenses were not sustained by reason of the plaintiff's antitrust violations but because of plaintiff's challenges to RCA patents.

Judge Moore commented, however, that RCA was not foreclosed from seeking treble damages or injunctive relief if it could plead and establish by proof the causation required by the statute. As he said:

> "RCA is not foreclosed from seeking treble damages or injunctive relief if it can plead, and establish by proof, that causation required by the statute. All that the district court decided was that 'the second counterclaim does not allege facts which confer upon defendant standing to sue for plaintiffs' alleged violations of the Sherman Act and the Clayton Act.' This is all that we affirm." S. C. M. Corp. v. Radio Corporation of America, *supra*, 407 F. 2d at 171.

All the *S. C. M.* case held was that there was no causal connection between the violations and plaintiff's injuries and that the real injury occurred to the licensees. Furthermore, in *S. C. M.*, Circuit Judge Timbers, then a district judge, dissented and strongly questioned the precedent in *Productive Inventions*. Judge Timbers concluded that where the defendant had acted to deter competition

and, as a result, the plaintiff suffered substantial injury, standing to sue should be granted.

Billy Baxter, Inc. v. Coca-Cola Company, *supra*, involved basically a similar relationship. Here, the plaintiff-franchisor asserting the rights of its franchisees brought a treble damage antitrust action against defendant manufacturers of nonalcoholic carbonated beverages for alleged use of improper methods to persuade retail outlets to buy products other than those it manufactured. In *Billy Baxter* the franchisees were innocent third parties and mere victims of the illegal activity. In addition, none of the producers who were affected by the persuasion were customers of Baxter, Inc. It is difficult to see how this case applies to our situation.

In Fields Productions Inc. v. United Artists Corporation, *supra*, the plaintiff, a motion picture producer, alleged that defendant, in block booking plaintiff's picture, allocated a sum of money to such picture which was less than fair value of the television rights in such picture. The district court held that plaintiff did not have standing to sue and maintain a private treble damage antitrust action. The district court however, did say that it was "the television stations and the other distributors who . . . [were] in the 'target area.' " *Id.* 318 F.Supp. at 88. Under this rationale, Calderone's three theatres would be in an analogous situation to the television stations (an exhibitor of the motion pictures) and here would fall within the so-called "target area." Therefore, Calderone, the owner of these three theatres is directly affected by the loss of revenue of these theatres, and it was reasonably foreseeable that Calderone would be so affected. Moreover, in *Fields,* the Court held that the damages asked for were unrelated to the alleged antitrust violations and thus held that there was no standing to sue.

Finally, in Lieberthal v. North Country Lanes, Inc., *supra*, a case not discussed by the majority opinion, the amended complaint was dismissed in the district court on account of lack of juris-diction because bowling does not involve interstate commerce. *Id.* 221 F.Supp. at 688. The fact that Judge Wyatt went further and intimated that the plaintiff has no standing to sue is purely *obiter dictum*. The Court of Appeals seems to have affirmed the district court decision on the ground "that the complaint does not establish a Sherman Anti-Trust violation based on acts occurring in interstate commerce" and expressed no opinion as to the question of standing to sue. *Id.* 332 F.2d at 272, 273.

It is obvious from the examination of these Second Circuit cases that none are on point. They have denied standing to sue in situations either where licensees are innocent victims or where a causal connection has not been established between the violation and the injury. These cases have involved neither landlord-tenant relationships (except for *Lieberthal*) nor cases where the lessee was an active participant in the conspiracy. In addition, a number of the cases have been sharply restricted to their particular facts.

Admittedly, the "target area" test applied by the Second Circuit has been more restrictive than in other circuits. However, here, the factual circumstances present a different situation unlike the ones presented in the previous cases discussed. The "target area" test applied to this particular set of facts should follow the Ninth Circuit's approach conceived in *Conference of Studio Unions* and *Karseal* and expanded in *Hoopes* and *Mulvey*. The test should consider not merely at whom the violations were aimed but rather at whom the violations were reasonably foreseen to affect.

### III. *Other Circuit Decisions*

Since the Second Circuit cases are not conclusive, I believe that the rationale in the Seventh and Ninth Circuits is validly applicable in this situation while the approach in the Third Circuit is not. *See* Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir. 1956); Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957); Melrose Realty Co.,

Inc. v. Loew's, Inc., 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), motion for leave to file petition for rehearing denied, 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 198 (1957); Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312 (E.D.Pa. 1953), aff'd, 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954).

Steiner v. 20th Century-Fox Film Corp. (1956), *supra*, a Ninth Circuit decision, involved a similar situation. In that case, the appellant, an owner of a motion picture theatre, leased the said theatre to individuals who conspired with defendants to monopolize first-run pictures, thereby forcing appellant to receive less than the reasonable rental value of the theatre and to do acts detrimental to the appellant's reversionary interest. The court clearly held that appellant-landlord had standing to sue under the antitrust laws.

The appellees in defense asserted that as a matter of law the appellant's interest as a landlord was too remote to permit recovery and cited the Third Circuit decision of Harrison v. Paramount Pictures, *supra*, as their authority. The court in *Steiner* distinguished the *Harrison* case and said that in *Harrison* there were no direct dealings between the plaintiff and the defendant. *Steiner, supra*, 232 F.2d at 193. In *Steiner* the appellees conspired with the prime lessee to force the appellant to receive less than the reasonable rent. Appellant was not seeking simply damages caused to another, the lessee, but was claiming direct injury to itself.

The majority opinion in our present case suggests that the *Steiner* decision is "clearly distinguishable" from Calderone's situation because the plaintiff in *Steiner* was the "target" of the alleged conspiracy. This, I cannot agree with. The cases are similar. Here, Calderone is alleging that its lessee, UATC, conspired with others to cause it direct injury and that it was a reasonably foreseeable victim of such illegal activity. Under the *Steiner* formula, Calderone

must have standing to sue. The Seventh Circuit a year later followed this approach in *Congress Buildings Corp., supra*, which I discussed earlier, and clearly affirmed the reasoning of the Ninth Circuit's rationale.

The majority opinion, nonetheless, mentions two decisions in the Third Circuit challenging the *Steiner* and *Congress* approach affording plaintiff's standing to sue. These decisions in the Third Circuit, however, are not clear as to their meaning and effect. In Harrison v. Paramount Pictures, Inc. (1944), *supra*, the court refused plaintiff-landlord standing to sue on the grounds that the nature of the property involved did not fit within the statutory scheme and that the injury was too remote. Besides these differences in factual findings between Harrison and our present case, the court also limited the import of its holding to the specific facts of that case. The court said:

"It is not possible to formulate any general rule by which to determine what injuries are too remote to bring a plaintiff within the scope of the Act and I shall not attempt to do so. Each case must be dealt with on its own facts. All that is decided here is that this plaintiff's loss, if any, is beyond the limit of injuries cognizable under the antitrust laws." Harrison v. Paramount Pictures, Inc., *supra*, 115 F.Supp. at 317.

In Melrose Realty Co. v. Loew's, Inc. (1956), *supra*, the court of appeals of the Third Circuit in a short *per curiam* opinion affirmed the lower court decision solely on the authority of the *Harrison* case. The court of appeals seems to have failed to heed the impact of the *Harrison* case which irrevocably stated that each case must be considered on its particular facts. On petition for rehearing, though, the appellants reiterated that the *Harrison* case was distinguishable and not controlling, the court still denied the petition, although Chief Judge Biggs dissented. The Chief Judge decried the *Harrison* rule and affirmed the Ninth Circuit approach in *Steiner* giving

plaintiff standing to sue. Chief Judge Biggs said:

> "The lessor suffers property damage because of the illegal act of the lessee arising out of the conspiracy and that injury is direct and not remote. The lessor should receive the protection of the Clayton Act. See Steiner v. 20th Century-Fox Film Corp. . . ."

Melrose Realty Co. v. Loew's, Inc., *supra*, 234 F.2d at 519–520.

The judicial reasoning by the Seventh and Ninth Circuits presents a logical and just approach to the situation while balancing the basic policy considerations of the antitrust laws. The Third Circuit rationale of *Harrison* has been severely questioned and is not applicable here.

### IV. *Other Arguments*

There are a number of other arguments stated by the majority for denying plaintiff standing to sue. I will briefly comment on them.

Although antitrust laws, as the majority points out, are not always meticulously defined and crystall clear and damages may be more speculative and difficult to prove as a result of the treble damage action, I know of no authority that compels this court to deny plaintiff standing to sue on these grounds. Difficulty or uncertainty in determining damages has never been a bar to suit. The Supreme Court confirmed this view in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), a case involving a violation of the Sherman Anti-Trust Act. The Supreme Court said:

> "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."

Story Parchment Co. v. Paterson Parchment Paper Co., *supra*, at 563, 51 S.Ct. at 250.

*See also* Bigelow v. R. K. O. Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652, rehearing denied, 327 U.S. 817, 66 S.Ct. 815, 90 L.Ed. 1040 (1946); Eastman Kodak Co. v. Southern Photo Material Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Hays v. United Fireworks Mfg. Co., 420 F.2d 836, 845 (9th Cir. 1969); Riverside Coal Co., Inc. v. United Mine Workers of America, 410 F.2d 267, 274 (6th Cir.), cert. denied, 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969); Entis v. Atlantic Wire & Cable Corp., 335 F.2d 759, 763–764 (2d Cir. 1964); National Wrestling Alliance v. Myers, 325 F.2d 768, 777 (8th Cir. 1963); William H. Rankin Co. v. Associated Bill Posters of United States and Canada, 42 F.2d 152, 155 (2d Cir.), cert. denied, 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765 (1930).

The majority opinion also expresses the fear of windfall recoveries and the opening of the "flood-gates" to all that are lured by possible treble damage relief, which would result in an "over-kill" enlarging the "private weapon to a caliber far exceeding that contemplated by Congress." Therefore, the majority suggests that we apply a "rule of reason" creating an "easily identifiable cut-off" to save the economy and the courts from a deluge of opportunistic suitors—a veritable Noah's Ark. I cannot agree. The language of the statute itself and the Supreme Court decisions considering this very question have unequivocally stated that the purpose of Section 4 is to encourage private treble damage suit, to deter antitrust violations, and to compensate those for injuries sustained. If Congress did not realize what it created, then it is for Congress, not the courts, to limit. Furthermore, even though the Supreme Court has denied certiorari in a number of Second Circuit cases that applied a restrictive "target area" test, this does not mean that the highest court has given affirmance to judicial legislation. The denials of certiorari in all the Second Circuit cases were based on different factual backgrounds. The decisions of the Supreme Court still hold that private treble damage actions should be given

their broadest and a most liberal interpretation. Those holdings are the best indication of the Supreme Court's position.

### V. *Conclusion*

The majority presents no convincing arguments to justify precluding appellant Calderone from suing under Section 4 of the Clayton Act. Calderone's claim to relief is consistent with the basic purpose of the statute and with the interpretation of the Supreme Court. It would fit under the directness doctrine or under the "target area" test as formulated by the Ninth Circuit. The Second Circuit cases involving the restrictive "target area" test have not encountered the essential facts or issues presented here and, thus, are not conclusive on this court. Neither is the case law precedent of the Third Circuit applicable in this case. The Seventh and Ninth Circuits put forth a far more feasible and flexible approach taking into account the fundamental policy considerations of the statute under which Calderone can sue.

Therefore, I have no alternative but to dissent and vote to reverse.

Kiley, Circuit Judge, dissented and filed opinion.