Nancy POLLOCK and Alexander
Moskovits, Plaintiffs,

v.

CITRUS ASSOCIATES OF the NEW YORK COTTON EXCHANGE, INC., ContiCommodity, Inc., Norton Waltuch, and "John Does" Nos. 1–10, Defendants.

No. 78 Civ. 0178.

United States District Court,
S. D. New York.

March 31, 1981.

As Modified May 6, 1981.

712

Leonard Toboroff, Christopher Lovell, Toboroff, Gottesman & Lovell, New York City, for plaintiffs.

Maurice Mound, Edward McDermott, Rein, Mound & Cotton, New York City, for defendant Citrus Associates of the New York Cotton Exchange, Inc.

Daniel J. O'Neill, Thomas A. Dubbs, Michael C. Gilbert, Chadbourne, Parke, Whiteside & Wolff, New York City, for defendants ContiCommodity Services, Inc. and Norton Waltuch.

## OPINION AND ORDER

PIERCE, District Judge.

This action arises from the trading of November 1977 orange juice futures contracts ("November Contracts") on the Citrus Associates of the New York Cotton Exchange, Inc. (the "Exchange") during the period October 1, 1977 through November 16, 1977. The defendant Exchange is a contract market, designated by the Commodity Futures Trading Commission (the "Commission") pursuant to Section 5 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 7, through which transactions in frozen orange juice concentrate futures are consumated. Defendant ContiCommodity Services, Inc. ("Conti") is a broker/dealer and a Class "A" member of the Exchange. Defendant Norton Waltuch ("Waltuch") is a sales representative for Conti, director of its financial capital unit, and manager of its New York branch. Conti and Waltuch allegedly trade futures contracts for their own accounts and the accounts of others. The plaintiffs, suing on behalf of an alleged class, are purportedly persons who sold November Contracts and did not liquidate their positions before November 16, 1977.[1]

Count I of the Second Amended Complaint (the "complaint") alleges that Conti, Waltuch, and others combined and conspired to manipulate the price of November Contracts in violation of the CEA, 7 U.S.C. §§ 1 et seq., and the rules and regulations promulgated thereunder. In essence, Count I alleges that Conti, Waltuch, and others effectuated a "squeeze" which drove the price of November Contracts to an artificially high level. Count II of the complaint alleges that Conti, Waltuch, and others conspired to restrain trade in the market for November Contracts in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Count III of the complaint alleges that the Exchange neglected to prevent the other defendants' manipulation of the November contracts market and failed to perform its regulatory duties, in violation of CEA, the rules and regulations of the Commission, and its own bylaws, rules, and regulations.

By notice of motion filed July 31, 1979, defendants Conti and Waltuch moved to dismiss the complaint pursuant to Fed.R. Civ.P. 12 or, alternatively, for summary judgment pursuant to Fed.R.Civ.P. 56. By notice of motion dated August 2, 1979, the Exchange moved for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). In a stipulation "so ordered" on November 27, 1979, the parties agreed to defer briefing and consideration of those motions until the Second Circuit's ruling in *Leist v. Simplot* and the other consolidated cases dealing with the issue of whether a private

---

1. This action was originally filed by Nancy Pollock on behalf of the alleged class. After a motion by Conti and Waltuch to strike the complaint as sham and false, pursuant to Fed. R.Civ.P. 11, was denied (*see* Opinion and Order dated November 28, 1978), a second amended complaint was filed by stipulation dated June 26, 1979, adding Alexander Moskovits as an additional named plaintiff. By stipulation "so ordered" on November 27, 1979, consideration of the plaintiffs' motion for class certification was held in abeyance pending the outcome of the within motions.

right of action existed under the CEA. On July 8, 1980, a divided panel ruled that a private right of action does exist under the CEA. *Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980).

At a pretrial conference held on October 7, 1980, the Court denied the plaintiffs' request that all the defendants' motions be dismissed without further submissions, and directed the plaintiffs to file responsive papers. Thereafter, the defendants filed reply papers and the plaintiffs, with leave of the Court, filed sur-reply papers on January 8, 1981.

On February 23, 1981, the Supreme Court granted petitions for certiorari in *Leist v. Simplot*, —— U.S. ——, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981). By letter to the Court dated February 24, 1981, counsel for Conti and Waltuch suggested that the Court may wish to defer ruling on the pending motions until after the Supreme Court's decision. Plaintiffs' counsel expressed objections to any further delay in a letter to the Court dated February 27, 1981. Considering that the Supreme Court's decision will probably not be rendered until next fall; that the motions to dismiss involve antitrust claims in addition to CEA claims; that this action was filed on January 10, 1978; and that consideration of the defendants' motions has already been delayed for more than a year, the Court declines to further postpone its consideration of the defendants' motions.

## DISCUSSION

### I. *Private Right of Action Under the CEA Against Conti and Waltuch*

Defendants Conti and Waltuch contend that *Leist v. Simplot* is not applicable to the instant action because the plaintiffs have failed to specify any particular provision of the CEA on which Count I is based. It is true that a private right of action cannot be implied under an entire Act which has more than one section. For example, under the Securities Exchange Act of 1934, a private right of action is specifically provided for in sections 9(e), 16(b), and 18; is implied under section 10(b), *Superintendent of Insurance v. Bankers Life and Casualty Company*, 404

U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); and is not implied under section 17(a), *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

Count I simply alleges a violation of 7 U.S.C. §§ 1–13. In its sur-reply memorandum of law, at 1 n.*, the plaintiffs argue that Count I states a manipulation claim under section 9(b) of the CEA, 7 U.S.C. § 13(b).

■ A fair reading of the complaint indicates that a Section 9(b) claim is stated in Count I. The majority in *Leist v. Simplot* ruled that a private right of action exists under section 9(b). Thus, insofar as the allegations of Count I are founded upon section 9(b), Conti's and Waltuch's motion to dismiss or for summary judgment with respect to Count I is denied. However, to the extent that Count I relies upon any other section of the CEA, the motion to dismiss by Conti and Waltuch is granted.

### II. *Private Right of Action Under the CEA Against the Exchange*

■ Similar to the other defendants, the Exchange contends that the failure of the plaintiffs to specify a specific statutory provision in Count III is fatal to their claims against the Exchange. However, as indicated in Paragraph 21(a) of the complaint, incorporated by reference into Count III, and in plaintiffs' sur-reply memorandum of law, at 43, the plaintiffs' claims against the Exchange are founded upon sections 5(d) and 5a(8) of the CEA, 7 U.S.C. §§ 7(d) and 7a(8). In *Leist v. Simplot, supra*, at 300–302, 322, the majority found that a private right of action could be implied under sections 5(d) and 5a(8) of the CEA.

However, the Exchange argues that assuming that this Court finds that sections 5(d) and 5a(8) are the foundation of plaintiffs' claims under Count III and that there is a private right of action under those sections—as it does find—the plaintiffs have failed to state a claim upon which relief can be granted.

Section 5(d) provides that in order for the Commission to designate a board of trade (i. e., exchange) a "contract market", the governing board of exchange must provide for the prevention of manipulation of prices. The defendant Exchange concedes that it promulgated a rule in conformance with this section prior to July 17, 1975. But, the defendant argues that section 5a(8) does not require the Exchange to enforce all its rules. That section states:

"5a. Each contract market shall—

\* \* \* \* \* \*

(8) enforce all by-laws, rules, regulations and resolutions made or issued by it or by the governing board thereof or any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, and which have been approved by the Commission pursuant to paragraph (12) of section 5a of this Act; and revoke and not enforce any such by-law, rule, regulation, or resolution, made, issued, or proposed by it or by the governing board thereof or any committee, which has been disapproved by the Commission."

Thus, the only rules that must be enforced, according to the defendant, are those that (1) are made by the governing board or by a committee of the Exchange, (2) relate to the terms and conditions in contracts of sale executed on the Exchange or to other trading requirements, and (3) have been approved by the Commission.

The Exchange's anti-manipulation rule clearly meets the first two conditions. Regarding the third condition, the defendant argues that the Commission never approved the Exchange's anti-manipulation rule, and thus, the plaintiffs' claims based on a failure to enforce that rule must be dismissed.

On July 18, 1975, the Commission promulgated Rule 1.53, 17 C.F.R. 1.53, which states:

"Each contract market shall enforce each bylaw, rule, regulation, and resolution, made or issued by it or by the governing board thereof or any committee thereof, which is in effect as of July 18, 1975, and which relates to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relates to other trading requirements, unless such bylaw, rule, regulation, or resolution has been disapproved by the Commission pursuant to section 5a(12) of the Act, or the amendment or revocation of such bylaw, rule, regulation or resolution has been approved by the Commission pursuant to section 5a(12) of the Act.

The Commission also adopted Rule 1.54, 17 C.F.R. 1.54, which states:

"Notwithstanding any provision of these rules, any bylaw, rule, regulation, or resolution of a contract market that was submitted to the Secretary of Agriculture pursuant or §§ 1.38(a) of 1.39(a) of these rules, and was either approved by the Secretary or not disapproved by him, as of April 21, 1975, shall continue in full force and effect unless and until disapproved, altered or supplemented by or with the approval of the Commission. The adoption of this rule does not constitute approval by the Commission of any contract market bylaw, rule, regulation or resolution.

The defendant contends that although the Commission has admonished the Exchange to enforce its rules, the Exchange is under no statutory duty to enforce its rules because they have not been "approved" by the Commission. Thus, the defendant argues, the plaintiffs may not sue the Exchange for failure to enforce its anti-manipulation rule.

Despite defendant's contrary contentions, its argument overlooks the enforcement and regulatory scheme envisioned by Congress. As noted by Judge Friendly in *Liest v. Simplot, supra,* at 296, it has been Congress' intent to strengthen the regulation of commodity futures trading. To allow an Exchange, approved as a "contract market" under section 5(d), to operate with rules it need not enforce would run contrary to this Congressional intention. In order to fill this regulatory gap, the Commission promulgated Rule 1.53. The promulgation of

that regulation was a proper exercise of the Commission's residual power grounded in the CEA and its rule-making authority. *See New York Mercantile Exchange v. Commodity Futures Trading Commission,* 443 F.Supp. 326, 330–31 (S.D.N.Y.1977) (dicta); 40 Fed.Reg. 30107 (July 17, 1975).

Thus, pursuant to section 5(d) and 5a(8) of the CEA, the Exchange was compelled to enforce its anti-manipulation rule. As previously discussed, the plaintiffs have a private right of action to enforce those sections. Accordingly, to the extent that Count III relies upon sections 5(d) and 5a(8) of the CEA, the Exchange's motion for judgment on the pleadings is denied. However, to the extent that Count III relies upon any other section of the CEA, the Exchange's motion is granted.

### III. *Antitrust Claims Against Conti and Waltuch*

As mentioned earlier, Count II of the complaint charges Conti and Waltuch with conspiracy to restrain trade in the November Contracts market, in violation of sections 1 and 2 of the Sherman Act. More specifically, the plaintiffs allege that Conti, Waltuch, and others conspired to restrain trade in the November Contracts market and actually did restrain trade by achieving dominance and control of the long side of the available November Contracts, thereby causing the price of November Contracts to rise to artificially high levels. Conti and Waltuch move to dismiss or, alternatively, for summary judgment with respect to Count II on the grounds that (1) the plaintiffs' assertion of claims under the CEA precludes their antitrust claim and (2) even if an antitrust claim may be brought along with their private action under the CEA, the plaintiffs lack standing to assert such a claim.

### A. *Preclusion of the Antitrust Claims*

Conti and Waltuch contend that the availability to plaintiffs of a specific reme-

dy under the CEA precludes them from maintaining a simultaneous claim under the more general trade restraint and monopolization prohibitions of the Sherman Act. In support of this argument, the defendants rely heavily upon *Smith v. Groover,* 468 F.Supp. 105 (N.D.Ill.1979) which in turn relied exclusively upon *Schaefer v. First National Bank of Lincolnwood,* 326 F.Supp. 1186, 1190–92 (N.D.Ill.1970), *aff'd,* 509 F.2d 1287, 1300 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976). In *Schaefer, supra,* an action charging manipulation of stock prices, the plaintiffs' complaint alleged common law fraud, violations of section 1 of the Sherman Act and various provisions of the Clayton Act, and violations of various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The district court dismissed the antitrust claims, reasoning that the plaintiffs could rely on the specific remedy implied from the securities laws. 326 F.Supp. at 1190. On appeal, the Seventh Circuit affirmed the trial court's decision and rationale. 509 F.2d at 1299–1300.

In *Smith v. Groover, supra,* the plaintiffs' complaint alleged in Count I that the defendants manipulated the price of soybean futures contracts in violation of the CEA and alleged in Count II that this same activity constituted a violation of sections 1 and 2 of the Sherman Act. Relying upon *Schaefer*—the controlling law of the Circuit in which the district court was located—the court ruled that the plaintiffs could not concurrently pursue the specific remedy under the CEA and the more general antitrust remedy, and, accordingly, dismissed the antitrust count.[2]

The plaintiffs herein urge this Court not to adopt the ruling of *Smith v. Groover, supra,* because (1) the "election of remedy" theory of *Schaefer* is not the law of this Circuit, and (2) Congress intended the federal courts to retain antitrust jurisdiction over claims such as those asserted by the plaintiffs.

---

**2.** Notably, the court found that the application of the antitrust laws in the CEA context was not impliedly repealed by passage of the Com-

modity Futures Trading Commission Act. 468 F.Supp. at 116.

■ Regarding the plaintiffs' first argument, the defendants have failed to cite and the Court is unaware of any Second Circuit decision which compels a plaintiff faced with a specific remedy under a regulatory statute and a general remedy under a broader statute to pursue solely the specific remedy.[3] Indeed, in the absence of contrary legislative intent in enacting the specific regulatory statute, the application of an election of remedy rule would be repugnant to Fed.R.Civ.P. 8(a)(3) and 8(e)(2) which specifically provide for pleading in the alternative.

An examination of the legislative history of the CEA indicates that Congress intended to permit antitrust claims to be asserted against commodity futures trading practices specifically proscribed by the CEA. Prior to the revision of the statute in 1974, antitrust jurisdiction was not mentioned in the CEA.[4] In enacting the Commodity Futures Trading Commission Act ("CFTCA"), Pub.L. No. 93–463, 88 Stat. 1389, in 1974, Congress concerned itself with two antitrust aspects of commodity futures regulation.

First, Congress was concerned about the antitrust implications of rules and regulations promulgated by the Commission or an approved exchange designed to insure an orderly market. This concern arose from cases such as *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), in which a New York Stock Exchange order directing member firms to discontinue wire connections with nonmembers was challenged on antitrust grounds. An earlier version of the bill which ultimately became the CFTCA expressly exempted from antitrust liability any registered exchange, association, trader, or broker who was acting pursuant to and in accordance with approved Commission or exchange regulations. *See Hearings on H.R. 11955 Before the House Comm. on Agriculture*, 93rd Cong., 2nd Sess., 347–48 (1974) (text of H.R. 11955). Relying upon the Justice Department's representation that such a broad antitrust exemption was unnecessary and undesirable in light of the Supreme Court's decision in *Silver, supra*, the House Agriculture Committee deleted the exemption, but included a provision, ultimately contained in the CFTFA, which requires the Commission to take into consideration the policy of the antitrust laws in adopting or approving rules and regulations. *See* H.R.Rep. No. 93–975, 93rd Cong., 2nd Sess., 23–28 (1974). *See generally* Johnson, *Antitrust in the Commodities Field: After Gordon*, 6 Hofstra L.Rev. 115, 119–24 (1977); Johnson, *Antitrust Under the CFTC Act: An Ounce of Prevention . . .*, 20 Antitrust Bulletin 441 (1975). The foregoing congressional concern is not particularly relevant to the antitrust violations alleged herein; the alleged trade restraints and monopolization conduct of the defendants were presumably not undertaken pursuant to a rule or regulation of the Exchange or Commission.

However, most relevant to the antitrust violations charged herein is Congress' second antitrust concern, poignantly expressed by House Judiciary Committee Chairman, Peter W. Rodino, Jr., in his testimony before the Senate Committee on Agriculture and Forestry. Congressman Rodino stressed "the peculiar intimacy and special relationship [the commodity futures] markets have with the fundamental national legal, economic, and social policies expressed in our antitrust laws since the en-

---

**3.** As far as the Court is aware, *Bucher v. Shumway*, 452 F.Supp. 1288 (S.D.N.Y.1978) is the only case in this Circuit to follow the rationale of *Schaefer*. The plaintiffs in *Bucher* alleged violations of the securities laws and antitrust laws in connection with a "friendly" tender offer for outstanding shares in a corporation. Relying upon the rationale of *Schaefer*, the district court dismissed the antitrust claims.

**4.** While there is a dearth of cases directly addressing the question of whether an antitrust claim could be asserted against commodity futures brokers and traders, discussions in several Second Circuit cases indicate that such claims were allowed prior to the passage of the CFTCA. *E. g., Miller v. New York Produce Exchange*, 550 F.2d 762 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *Klebanow v. New York Produce Exchange*, 344 F.2d 294, 299–300 (2d Cir. 1965).

actment of the Sherman Act in 1890." *Hearings on S. 2485, S. 2578, S. 2837 and H.R. 13113 Before the U.S. Senate Committee on Agriculture and Forestry,* 93rd Cong., 2nd Sess. 258 (1974). He further stated:

> "In brief, in successive years, wheat, soybeans, and corn have been subjected to anticompetitive and monopolistic practices in commodity markets and have significantly contributed to food prices charged consumers. These developments indicate the urgency of applying antitrust principles to the commodity markets unequivocally . . . ." *Id.* at 259.

Congressman Rodino requested that the jurisdictional provision of H.R. 13113 (the bill reported out of the House Agriculture Committee) be clarified so as to confirm the federal court's jurisdiction, including its antitrust jurisdiction. *Id.* at 260.

As a result of this suggestion, the Senate Agriculture and Forestry Committee inserted in the bill a provision substantially similar to the one suggested by Congressman Rodino. *See* S.Rep. No. 93–1131, 93rd Cong., 2nd Sess., 6, 23, U.S.Code Cong. & Admin.News 1974, 5843 (1974). This provision, accepted by the Conference Committee and enacted in Section 201(b) of the CFTCA, 7 U.S.C. § 2, states: "Nothing in this Section [the entire CEA] shall supersede or limit the jurisdiction conferred on courts of the United States or any State." While the proviso does not explicitly mention antitrust jurisdiction, as discussed, the legislative history makes clear that the provision was enacted, in part, to preserve federal antitrust jurisdiction over trading practices that constitute restraints of trade. *See* Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy,* 29 Vanderbilt L.Rev. 1, 32–36 (1976).

In sum, the legislative history of the CFTCA indicates that Congress intended that antitrust claims be allowed against brokers and traders operating in the commodity futures markets. Further, there is no indication that Congress intended a private right of action under the CEA to be an exclusive remedy for price manipulation.[5] Accordingly, in view of Congress' intent and Rule 8 of the Federal Rules of Civil Procedure which permits pleading in the alternative, the Court rules that the plaintiffs may concurrently plead for relief under the CEA and the Sherman Act.

## B. *Standing to Assert the Antitrust Claims*

Conti and Waltuch contend that even if antitrust claims may be asserted concurrently with a claim founded upon the CEA, the plaintiffs lack standing to assert such claims. Section 4 of the Clayton Act, 15 U.S.C. § 15, states:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . without respect to the amount in controversy . . . ."

Literally read, this statute would permit a lawsuit by virtually any party affected by an antitrust violation, regardless of the remoteness of the injury. Through the years, however, the courts have developed various doctrines designed to limit the portals to a treble damage action. These doctrines include (1) limitations upon what constitutes "antitrust injury", *see e. g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); (2) the use of "pass-on" theories, *see Illinois Brick v. State of Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); and (3) "standing" limitations, *see e. g., Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) and cases cited in note 6 *infra.*

---

**5.** The creation of an exclusive remedy under the CEA cannot be implied from the legislative history and such an implication would be disfavored. *Cf. United States v. Philadelphia National Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963) ("Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.").

Each of these doctrines—antitrust injury, pass-on, and standing—address different aspects of section 4 and are, in a narrow sense, analytically distinct. *Illinois Brick, supra,* 431 U.S. at 728 n.7, 97 S.Ct. at 2065 n.7; *Mid-West Paper Products Co. v. Continental Group,* 596 F.2d 573, 582 (3d Cir. 1979). Nonetheless, in addressing the question of whether the plaintiffs in this action have standing to assert their antitrust claims, the decisions and rationales of the antitrust injury and pass-on cases cannot be ignored. This is especially true because the Supreme Court has not passed upon an antitrust standing case.[6]

Under controlling Second Circuit precedents, only a person in the "target area" of an antitrust conspiracy has standing to sue; standing is restricted to those persons or businesses "against which competitive aim is taken." *Calderone, supra,* at 1296 n.2. *See Long Island Lighting Co. v. Standard Oil,* 521 F.2d 1269 (2d Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183 (2d Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). The rationale of the target area rule is to accommodate a sufficient number of private plaintiffs to deter antitrust law violations while preventing an "over-kill" use of the treble damages weapon. *Calderone, supra,* at 1295. In its most recent ruling in this area, the Second circuit has stated that the target area test is ultimately a test of "whether there is a legally significant causal relationship between the alleged violation and the alleged injury." *Reading Industries v. Kennecott Copper Corp.,* 631 F.2d 10, 13 (2d Cir. 1980).

Conti and Waltuch contend that since the plaintiffs have failed to allege that they purchased November Contracts from either of them, their claims are barred by the rationale of *Illinois Brick,* as applied in *Mid-West Paper Products, supra,* and *Liang v. Hunt,* 477 F.Supp. 891 (N.D.Ill.1979). In *Mid-West Paper Products, supra,* the plaintiffs sought treble damages against the defendants, manufacturers of consumer bags who allegedly fixed the price of bags. Although one of the plaintiffs had purchased from a non-conspiring bag manufacturer rather than one of the defendants, it alleged that it paid artificially high prices for those bags because the non-conspiring manufacturer was able to charge artificially high prices under the price "umbrella" of his price-fixing competitors. A divided Third Circuit panel affirmed the dismissal of the plaintiff's action for lack of standing. Though the court recognized that "pass-on" was not the issue, it applied the rationale of *Illinois Brick,* and found that an attempt to determine the price the defendants' competitors would have charged in absence of the conspiracy would "at the very least be highly conjectural", *id.* at 584, and would "transform this antitrust litigation into the sort of complex economic proceeding that the *Illinois Brick* Court was desirous of avoiding." *Id.* at 585.

■ In this case, the Court rules that the rationale of *Illinois Brick* is not a bar to the plaintiffs' antitrust claims.[7] The plaintiffs allege that Conti and Waltuch and perhaps others conspired to develop a monopolistic position on the long side of the November Contracts market. During the final hours of trading in November Contracts, when persons in a short position, such as the plaintiffs, were seeking to liquidate their position through the purchase of offsetting

---

**6.** That is, the Supreme Court has never decided which of the many standing tests (e. g., the direct injury test, *Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir. 1910); the target area test, *Calderone, supra;* the foreseeable target area test, *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); the zone of interests test, *Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142 (6th Cir. 1975)) are permissible under section 4 of the Clayton Act.

**7.** Initially, it should be made clear that this is not a pass-on case to which the *holding* of *Illinois Brick* is applicable. Although the plaintiffs and defendants were required to deal through agents, they were in direct contact insofar as they were on opposite sides of the November Contracts market. For a succinct discussion of the mechanics of futures contracts trading, *see Leist v. Simplot, supra,* at 286–88.

long positions, the defendants allegedly withheld their long positions, thereby driving up the price of November Contracts. Essentially, the defendants purportedly caused the price of November Contracts to rise by restricting the supply of offsetting contracts. Given a market in which the demand by shorts for offsetting contracts apparently outstripped the supply of offsetting contracts and the actual commodity, the price of November Contracts moved upwards. This upward movement intensified as the deadline for trading in November Contracts approached.

These allegations, coupled with the fact that futures contracts trading is a "zero sum game" (i. e., every gain can be matched with a corresponding loss), *see Leist v. Simplot, supra,* at 286–87, leads the Court to conclude that the plaintiffs were well within the "target area" of the defendants' alleged anticompetitive behavior; that is, their anticompetitive behavior was "aimed" at the plaintiffs. Stated another way, the Court finds that there is a "legally significant causal relationship between the [defendants'] alleged violation and the [plaintiffs'] alleged injury." *Reading, supra,* at 12.

The plaintiffs allege that they were forced to pay higher prices due to the defendants' restriction on the supply of offsetting contracts. Regardless of whether the plaintiffs ultimately purchased offsetting contracts from the defendants or from other traders with a long position,[8] the price throughout the market allegedly rose as a result of the defendants' activities.[9] In short, while—as is true with the vast majority of antitrust cases—proof of damages will most likely not be simple, this is not an action "based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change." *Reading, supra,* at 14 (discussing the implications of *Illinois Brick* and citing *Mid-West Paper Products, supra*).

Finally, a denial of standing to the plaintiffs at bar would effectively preclude all antitrust claims against Conti and Waltuch. Unlike *Illinois Brick,* in which there were other plaintiffs who could, at least theoretically, pursue claims against the defendants, the plaintiffs herein are the parties closest to and most directly affected by the alleged antitrust violations.

In conclusion, the Court rules that the plaintiffs have standing to assert their antitrust claims. Accordingly, the defendants' motion to dismiss or, in the alternative, for summary judgment with respect to Count II is denied.

### IV. *Summary*

With respect to Count I, the plaintiffs state a claim against Conti and Waltuch under section 9(b) of the CEA; thus, defendants' motion to dismiss or for summary judgment with respect to that claim is denied. In all other respects, the defendants' motion to dismiss Count I is granted.

Regarding Count II, the defendants' motion to dismiss or for summary judgment is denied.

With regard to Count III, the plaintiffs state a claim against the Exchange under sections 5(d) and 5a(8) of the CEA; thus, the Exchange's motion for judgment on the pleadings with respect to that claim is denied. Otherwise, the Exchange's motion for judgment on the pleadings is granted.

8. In their sur-reply memorandum of law, at 27 n.*, the plaintiffs assert that, due to the trading mechanism used by the Exchange, it would be virtually impossible to ascertain from whom the plaintiffs purchased and to whom the defendants sold.

9. This type of price increase is distinguishable from the "umbrella" pricing situation in *Mid-West Paper Products, supra.* In a market in which supply is restricted, prices move up naturally pursuant to basic laws of supply and demand. In a market in which an oligopoly or price fixing arrangement allows a relatively small seller to raise its price to the level protected by the price "umbrella", the small seller is not "compelled" to raise his price to the same extent as a seller in a supply restricted market. Thus, the severe difficulties attendant with proving damages in an "umbrella" pricing situation, which troubled the court in *Mid-West Paper Products, supra,* are not present in the case at bar.

. Finally, with regard to the class certification motion that has been held in abeyance pending the disposition of the within motions, the parties are directed to *expeditiously* complete discovery, if any remains, relevant to the class certification issue. Magistrate Sinclair is directed to supervise such discovery and inform the Court when the parties are prepared to file submissions on the class certification motion.

SO ORDERED.