661 F.Supp.2d 1172 (2009)
In re WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION,
Texas-Ohio Energy, Inc.
v.
Centerpoint Energy, Inc., et al.
Fairhaven Power Company
v.
Encana Corporation, et. al.
Abelman Art Glass
v.
Encana Corporation et al.
Utility Savings & Refund Services, LLP, et al.
v.
Reliant Energy Services, Inc., et al.
Ever-Bloom, Inc., et al.
v.
AEP Energy Services, Inc., et al.
J.P. Morgan Trust Co., N.A.
v.
Williams Companies, Inc., et al.
Learjet, Inc., et al.
v.
Oneok, Inc., et al.
Breckenridge Brewery of Colorado, LLC, et al.
v.
Oneok, et al.
Arandell Corp., et al.
v.
Oneok, et al.
Heartland Regional Medical Center, et al.
v.
Oneok, et al.
Multiut Corporation
v.
Dynegy, Inc., et al.
MDL No. 1566. Nos. 2:03-CV-01431-PMP-PAL, 2:04-CV-00465-PMP-PAL, 2:05-CV-00243-PMP-PAL, 2:05-CV-00437-PMP-PAL, 2:05-CV-00110-PMP-PAL, 2:05-CV-01169-PMP-PAL, 2:05-CV-01331-PMP-PAL, 2:06-CV-00233-PMP-PAL, 2:06-CV-01351-PMP-PAL, 2:07-CV-01019-PMP-PAL, 2:07-CV-00987-PMP-PAL, 2:05-CV-01300-PMP-PAL.
United States District Court, D. Nevada.
October 12, 2009.
*1174 Abelman Art Glass, pro se.
Ever-Bloom, Inc., pro se.
Maximum Nursery, Inc., pro se.
Texas-Ohio Energy, Inc., pro se.
Alan J. Mandel, Alan J. Mandel, Ltd., Skokie, IL, Ira P. Gould, Greenberg Trauring, LLP, Chicago, IL, Sylvie K. Kern, Glancy Binkow & Goldberg, San Francisco, CA, Charles A. Moore, Dewey & Leboeuf LLP, Houston, TX, Kathleen S. Rogers, Glancy Binkow & Goldberg LLP, Michael P. Lehmann, Cohen, Milstein, Hausfeld & Toll P.L.L.C., San Francisco, CA, Matthew C. Hans, S. Jay Dobbs, Polsinelli Shalton Flanigan Suelthaus, St. Louis, MO, Gregory M. Bentz, Polsinelli Shughart, Kansas City, MO, Matthew Corcoran, Melvin Goldstein, Goldstein & Associates, Washington, DC, Philip M. Ballif, Durham Jones & Pinegar, Salt Lake City, UT, Alexander T. Pendelton, Robert L. Gegios, William E. Fischer, Kohner, Mann & Kailas, S.C., Milwaukee, WI, Dennis D. Palmer, Jennifer Gille Bacon, Kathleen A. Hardee, Russell S. Jones, Jr., Cathy J. Dean, Gregory M. Bentz, Polsinelli Shughart, P.C., R. Lawrence Ward, Shughart Thomson & Kilroy, PC, Kansas City, MO, Donald D. Barry, Barry Law Offices, L.L.C., Eric I. Unrein, Davis, Unrein, Biggs & Head, L.L.P., Topeka, KS, Gary D. McCallister, Gary D. McCallister & Associates, LLC, Chicago, IL, Gregory L. Musil, Shughart Thompson & Kilroy, Overland Park, KS, Sylvie K. Kern, Glancy Binkow & Goldberg, San Francisco, CA, Von S. Heinz, Lewis & Roca, LLP, Las Vegas, NV, Thomas H. Brill, Law Office of Thomas H. Brill, Mission Hills, KS, Sarah Jane Gillett, Graydon Dean Luthey, Jr., Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for Learjet, Inc., Breckenridge Brewery of Colorado, LLC, Sinclair Oil Corporation, Topeka Unified School District 501, BBD Acquisition Co., Arandell Corp., Heartland Regional Medical Center, Prime Tanning Corporation, Missouri Public Service Commission, Merrick's Inc., Multiut Corporation, Safety-Kleen Systems, Inc., Sargento Foods, Inc., Ladish Co., Inc., Reorganized Fli, Inc., Newpage Wisconsin System Inc., Ever-Bloom, Inc., Fairhaven Power Company.
Sherry A. Knutson, Sidley Austin LLP, Chicago, IL, Khai Lequang, William Molinski, Orrick, Herrington & Sutcliffe, LLP, Los Angeles, CA, Martin M. Loring, Blackwell, Sanders, Peper, Martin, Kansas City, MO, Glen G. Reid, Jr., Robert E. Craddock, Jr., Wyatt, Tarrant & Combs, LLP, Memphis, TN, Michelle B. Goodman, Steven A. Ellis, Mark E. Haddad, Sidley Austin LLP, Los Angeles, CA, Bruce A. Schultz, Madison, WI, Joshua D. Lichtman, Fulbright & Jaworski, L.L.P., Los Angeles, CA, Thomas P. Schult, Berkowitz, Oliver, Williams, Shaw & Eisenbrandt, LLP, James Richard Eiszner, Lori Renee Schultz, Shook Hardy & Bacon, Kansas City, MO, Kristen Bird, Marshall M. Searcy, Roxanna Manuel, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA, Joel B. Kleinman, Dickstein Shapiro LLP, Washington, DC, Stacy Williams, Locke Lord Bissell & Liddell LLP, Charles A. Moore, Dewey & Leboeuf LLP, Houston, TX, Michael J. Kass, *1175 John M. Grenfell, Michael J. Kass, Pillsbury Winthrop Shaw Pittman LLP, San Francisco, CA, Douglas R. Tribble, Pillsbury Winthrop Shaw Pittman LLP, San Diego, CA, Barry S. Hyman, Samantha C. Norris, William M. Hannay, Schiff Hardin LLP, Chicago, IL, James W. Richgels, Quarles & Brady, LLP, Madison, WI, Kelly H. Twigger, Quarles & Brady LLP, Milwaukee, WI, Heather L. Cupp, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Amelia A Fogleman, John Henry Rule, Mason G. Patterson, Craig A. Fitzgerald, Scott R. Rowland, Oliver S. Howard, Gable & Gotwals, Sarah Jane Gillett, Brandon B. Rule, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, William R. Urga, Jolley Urga Wirth Woodbury & Standish, J. Randall Jones Harrison, Kemp & Jones, LLP Jennifer Dorsey, Kemp, Jones & Coulthard, LLP, Las Vegas, NV, Richard P. Levy, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for Coral Energy Resources, LP, Sempra Energy Corp., Dynegy Holding Co., Inc., Dynegy INC. Holding Company, Dynegy Marketing & Trade, Dynegy Power Marketing, Inc., West Coast Power LLC, EPNG Mojave, Inc., Mojave Pipeline Company, Mojave Pipeline Operating Company, Oneok Energy Marketing & Trading Company, LP, Oneok, Inc., Williams Merchant Services Company, Inc., Williams Energy Services Company Williams Energy Marketing & Trading Company, Williams Companies, Inc., West Coast Power LLC, Williams Power, Aquila Merchant Services, Inc. Aquila, Inc., Kansas Gas Marketing Company, Oneok Energy Services Company, L.P., CMS Enterprises Group, Inc., CMS Marketing, Service & Trading Company, CMS Energy, Dynegy GP Inc. Dmt Holding, LP, DMT G.PG. LLC, Xcel EGrantednergy Inc., El Paso Corporation, El Paso Marketing LP.

ORDER
PHILIP M. PRO, District Judge.
Presently before the Court is Defendants' Motion for Judgment on the Pleadings That All Antitrust Claims are Barred by the Commodity Exchange Act (Doc. # 1360), filed on September 26, 2008. Plaintiffs filed an Opposition (Doc. # 1402) on October 27, 2008. Defendants filed a Reply (Doc. # 1433) on November 24, 2008.

I. BACKGROUND
These cases are part of a consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001. Plaintiffs allege Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers. Specifically, Plaintiffs allege Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering false reports concerning trade information to trade indices, engaging in wash trades, and churning, which conduct violated various state and federal laws, including antitrust laws.
Defendants move for judgment on the pleadings, arguing Plaintiffs' federal and state antitrust claims and their state unfair competition claims are barred by the doctrine of implied antitrust immunity. Defendants rely upon the test set forth in Credit Suisse Securities (USA) LLC v. Billing, 551 U.S. 264, 127 S.Ct. 2383, 168 L.Ed.2d 145 (2007), to argue that applying antitrust laws to Defendants' alleged conduct would be incompatible with the Commodity Exchange Act ("CEA") because evidence of unlawful activity would overlap with evidence of lawful activity, such cases would involve complex legal line drawing which should be done by an expert agency and not by non-expert judges and juries, *1176 and the CEA provides for limited remedies for violations of the Act which should not be circumvented through antitrust actions.
Plaintiffs respond the CEA does not expressly provide for antitrust immunity, and the CEA contains a savings clause which preserves antitrust claims. According to Plaintiffs, the legislative history demonstrates Congress intended the antitrust laws to apply. As to the Credit Suisse test, Plaintiffs argue the test was developed under the securities laws and does not extend to the CEA. Plaintiffs also argue that even if Credit Suisse applies, there is no incompatibility between the CEA and antitrust laws because the CEA always bars collusive intentional price manipulation, as Plaintiffs allege here. Finally, Plaintiffs argue Credit Suisse does not apply to state law antitrust or unfair competition claims.

II. LEGAL STANDARD
A motion for judgment on the pleadings brought pursuant to Federal Rule of Civil Procedure 12(c) may be brought "[a]fter the pleadings are closedbut early enough not to delay trial...." The Court properly grants judgment on the pleadings when, taking all allegations in the pleading as true, the moving party establishes that on the face of the pleadings, no material issue of fact remains and the moving party is entitled to judgment as a matter of law. Knappenberger v. City of Phoenix, 566 F.3d 936, 939 (9th Cir.2009); Yanez v. United States, 63 F.3d 870, 872 (9th Cir. 1995).

III. DISCUSSION
The CEA does not contain a provision expressly preempting the application of antitrust laws to activity within the regulatory authority of the Commodity Futures Trading Commission ("CFTC"). Rather, legislative history and relevant Supreme Court authority suggest that antitrust laws apply to such conduct unless the specific activity is shielded by the doctrine of implied antitrust immunity.
The CEA's legislative history supports the conclusion that Congress did not intend the CEA to oust completely the application of the antitrust laws in the regulated area. In relation to the 1974 amendments to the CEA, the House of Representatives considered, but did not include, an express antitrust exemption. See Hearings Before the Committee on Agriculture & Forestry, United States Senate, on S.2485, S. 2578, S. 2837, and H.R. 13113, 93rd Cong., 2d Sess. 259, 661, 759 (1974). In hearings before the Senate, the Department of Justice objected to any express antitrust exemption, arguing that the existing law of implied antitrust immunity would suffice to resolve any conflicts between the CEA and the antitrust laws. Id. at 661-62. Likewise, Peter Rodino, Jr. ("Rodino"), Chairman of the House of Representatives Committee on the Judiciary, urged the Senate not to include an antitrust exemption. Id. at 259.
The Department of Justice also objected to the proposed language granting the CFTC exclusive jurisdiction, contending that it might be "interpreted to deprive the Federal courts of their jurisdiction under the antitrust laws and to deprive Federal and State courts of jurisdiction to enforce contract and commercial law rights." Id. at 663. In response to this objection, the Senate committee chairman stated: "I doubt that this committee, and I doubt the House had in mind depriving either Federal courts or jurisdictions in antitrust matters, or any other matter, and certainly not State courts." Id. at 664. The chairman proposed the Department of Justice work with the committee's staff to propose language to "make it clear that we don't propose to deprive Federal courts of antitrust jurisdiction, or State courts' jurisdiction."[1] *1177 Id. Likewise, in his testimony at the Senate hearings, Rodino questioned the exclusive jurisdiction provision and advocated that the Senate modify it to make clear the antitrust laws continued to apply. Id. at 259-60. Rodino suggested the Senate add to the exclusive jurisdiction provision that "`nothing herein contained shall supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities and on federal court ...'" Id. at 260 (emphasis in original).
The 1974 amendments added to the exclusive jurisdiction section the following: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). Courts have read this provision, sometimes referred to as a "savings clause," and its corresponding legislative history to mean that the CEA does not foreclose the application of other state and federal law. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 386-87, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (making reference to the savings clause in holding an implied private right of action existed under the CEA);[2]Am. Agric. Movement, Inc. v. Board of Trade of City of Chicago, 977 F.2d 1147, 1154-55 (7th Cir.1992) (referring to savings clause in determining CEA did not preempt antitrust claims under preemption principles), abrogated on other grounds by Freightliner Corp. v. Myrick, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); Strax v. Commodity Exch., Inc., 524 F.Supp. 936, 940-41 (S.D.N.Y.1981) (rejecting antitrust defendants' argument that the CEA impliedly repealed the antitrust laws); Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc., 512 F.Supp. 711, 716-17 (S.D.N.Y. 1981) (holding the plaintiffs could plead claims under the CEA and antitrust laws in the alternative); see also Ricci v. Chicago Mercantile Exch., 409 U.S. 289, 302 n. 13, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) ("Nor do we find that Congress intended the Act to confer general antitrust immunity on the Exchange and its members with respect to that area of conduct within the adjudicative or rulemaking authority of the Commission or the Secretary.").
Although the CEA does not expressly preempt antitrust laws, the savings clause does not expressly preserve all antitrust actions. Because the CEA, and the CFTC acting thereunder, in some instances permit or even encourage conduct that otherwise would constitute illegal restraints of trade, the Court must determine whether, and in what respects, the CEA implicitly precludes the antitrust laws' application. Credit Suisse, 551 U.S. at 271, 127 S.Ct. 2383; Ricci, 409 U.S. at 303-04, 93 S.Ct. 573.
Under the doctrine of implied antitrust immunity, the Court implies the repeal of the antitrust laws "`only if necessary to make the [CEA] work, and even then only to the minimum extent necessary.'" Credit Suisse, 551 U.S. at 271, 127 S.Ct. 2383 (quoting Silver v. N.Y. Stock Exch., 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)). The Court should reconcile the antitrust and CEA statutory schemes where possible, "rather than holding one completely ousted." Id. (quotation *1178 omitted). An implied repeal of the antitrust laws is appropriate "`only where there is a plain repugnancy between the antitrust and regulatory provisions.'" Id. (quoting Gordon v. N.Y. Stock Exch., Inc., 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (internal quotation omitted)). Determining whether implied antitrust immunity applies "may vary from statute to statute, depending upon the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both' sets of laws." Id. at 271, 127 S.Ct. 2383.
To determine whether a plain repugnancy exists between the antitrust laws and the CEA, the Court considers the following factors:
(1) the existence of regulatory authority under the [regulatory] law to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority; ... (3) a resulting risk that the [regulatory] and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct[, and] (4) ... the possible conflict affect[s] practices that lie squarely within an area of ... activity that the [regulatory] law seeks to regulate.
Id. at 275-76, 127 S.Ct. 2383.
With respect to the third factor, the Court should consider whether permitting the antitrust action to proceed would harm the regulated area, even in situations where the regulatory authority disapproves, and likely will continue to disapprove, the challenged conduct. Id. at 279, 127 S.Ct. 2383. Harm to the regulated area may occur where permitting the antitrust action to proceed would result in "an unusually serious legal line-drawing problem," such as where "only a fine, complex, detailed line separates activity that the [regulatory authority] permits or encourages... from activity that the [regulatory authority] must ... forbid...." Id. In such cases, the evidence tending to show unlawful antitrust activity overlaps with or is identical to evidence tending to show lawful conduct under the CEA. Id. at 281, 127 S.Ct. 2383. Where a "nuanced" evaluation of such evidence is necessary to separate what is lawful from what is unlawful, such determinations should be left to the expert regulatory authority because a risk exists that "different nonexpert judges and different nonexpert juries" would evaluate that evidence and reach different results. Id. at 280-82, 127 S.Ct. 2383. In such a situation, antitrust courts are "likely to make unusually serious mistakes," resulting in the deterrence of permitted or encouraged conduct under the CEA. Id. at 282-83, 127 S.Ct. 2383.
The Court also should consider the degree to which there is an enforcement-related need for antitrust lawsuits. Id. at 283, 127 S.Ct. 2383. The active enforcement of applicable rules forbidding the conduct in question by the regulatory authority lessens the need for private antitrust lawsuits. Id. Additionally, the ability of private individuals to sue for harm directly under the regulatory scheme lessens the enforcement-related need for antitrust suits. Id. Finally, if the regulatory entity is required to take into account competitive considerations when creating policy and its rules and regulations incorporate these considerations, the need for private antitrust enforcement is lessened. Id.
Here, the Complaints cite to numerous enforcement actions by the CFTC against Defendants and others for alleged manipulation of natural gas prices through practices such as wash trades and false price reports during the relevant time period. (Am. Compl. (Doc.# 847) ["Arandell Compl."] at ¶¶ 18, 22, 29, 34-35, 42, 46, 51, 53, 58, 62, 66-68, 77-80; Second Consol. *1179 Am. Class Action Compl. (Doc. # 201) ["Consol. Compl."] at ¶¶ 154-55, 157, 161, 163, 170, 173, 176-77, 182-83.)[3] Consequently, on the face of the pleadings, a regulatory authority exists which has in fact exercised that authority over the same type of conduct which Plaintiffs allege as the basis for their antitrust claims.[4] Maintenance of a commodities market free from manipulation is central to its operation. Therefore, the first, second, and fourth factors of the Credit Suisse test are satisfied.
The question in this matter is whether, in the context of alleged manipulation of natural gas prices, there exists a risk that applying both the CEA and the antitrust laws would result in conflicting guidance, requirements, duties, privileges, or standards of conduct. Defendants contend these cases present unusually serious legal line-drawing problems because Plaintiffs' Complaints allege activity which is permissible under the CEA in relation to price reporting, wash trades, and churning.
With respect to the alleged false price reporting, Defendants contend that there is a fine line between a false price report made with an intent to manipulate the market as opposed to merely negligent or "sense of the market" reporting without the intent to manipulate, which Defendants contend would not violate the CEA. Although evidence of intentionally false price reporting likely would overlap with evidence of negligent misreporting, no "nuanced" evaluation of the evidence is necessary to separate what is lawful from what is unlawful, and no expertise by the CFTC would be required to make such determinations. Plaintiffs allege a conspiracy to manipulate natural gas prices accomplished, in part, through intentional false price reporting. Arandell Compl. at ¶¶ 73-76 (alleging knowing false reports, conscious decisions to collusively manipulate the markets, and agreement to report false trades); Consolidated Compl. at ¶¶ 113, 128-29 (alleging conspiracy to manipulate natural gas market, by, among other things, falsely reporting prices and volumes.) Specifically, Plaintiffs allege Defendants "agreed with each other to and knowingly made false reports of natural gas trades to trade publications ... knowing that those publications use those reports to report market prices and volumes, and knowing that by doing such they could manipulate markets to the detriment of natural gas buyers." (Arandell Compl. at ¶ 81b; see also Consol. Compl. at ¶ 128 ("Part of Defendants' and their co-conspirators' scheme to manipulate natural gas prices was to provide false information to natural gas trade indices.").) Plaintiffs' Complaints also reference the CFTC enforcement actions, in which the CFTC brought charges against various natural gas companies for reporting fictitious trades, reporting trades in which the price or volume were altered, or reporting other trades observed in the market as the company's own transactions. (Request for Judicial Notice (Doc. # 1360-3).)
No special expertise is required to determine whether a natural gas company's reports of fictitious trades, altered price reports, or other's trades as their own were negligent versus intentional, or *1180 whether such reports were made as part of a conspiracy to manipulate prices. Intent and the existence and scope of a conspiracy are matters which judges and juries resolve every day. Antitrust courts are not likely to make "unusually serious mistakes" regarding intent, knowledge, purpose, or agreement, such that permissible or encouraged conduct under the CEA would be deterred.
As to wash trades, Defendants argue that not everything Plaintiffs allege as a wash trade constitutes a wash trade under the CEA. Defendants contend that under the CEA, a wash trade must involve no market risk, whereas Plaintiffs' Complaints allege wash trades involving "roughly" the same amount and price. Defendants also argue Plaintiffs allege churning, yet the CFTC never made any charges of churning against Defendants or other natural gas marketers during the relevant period.
The CEA specifically prohibits transactions "commonly known to the trade as, a `wash sale.'" 7 U.S.C. § 6c(a). Whether a particular pair of trades are technically wash trades within the CEA's meaning is not determinative of Plaintiffs' antitrust claims. Plaintiffs do not allege violations directly under the CEA. Rather, they allege intentional price fixing through means such as prearranged trades of roughly the same volume and price done in furtherance of the alleged price manipulation conspiracy for the purpose of manipulating the natural gas market. The CEA prohibits commodities market price manipulation by any practice or device, as Defendants acknowledge.[5]See 7 U.S.C. § 13(a)(2)(making it a felony for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce" or to "knowingly ... deliver or cause to be delivered ... false or misleading or knowingly inaccurate reports concerning crop or market information....").
The Arandell Complaint alleges Defendants engaged in wash sales, which the Arandell Complaint defined as:
an agreement by which Company A would agree with Company B that Company A would agree to sell a certain amount of natural gas at a certain price to Company B, and that in return Company B would sell roughly the same amount of natural gas at roughly the same price to Company A. By doing this, Company A and Company B would create the illusion of higher demand, and a higher volume of sales, in the market place, and would thus achieve their objective of increasing or otherwise manipulate the price of natural gas sold in interstate commerce.
(Arandell Compl. at ¶ 81a.) The Consolidated Complaint alleges "Defendants and their co-conspirators engaged in wash trades with the purpose and effect of unfairly and unlawfully setting and maintaining inflated, bundled natural gas prices ... and thereby colluded to increase the basis differential throughout California and cause all prices of which it was a component... to increase...." (Consol. Compl. at ¶ 133.) Plaintiffs thus allege Defendants conspired to and in fact engaged in prearranged, intentional agreements to make offsetting trades, with the objective of manipulating natural gas prices. Plaintiffs do not allege merely a pattern of roughly offsetting trades, without an accompanying intent to manipulate the market. With respect to churning, that the CFTC made no reported finding one way or the other regarding such conduct has no bearing on Plaintiffs' allegations that Defendants engaged in such conduct for the purpose of manipulating natural gas prices.
*1181 Consequently, accepting as true the allegations in the pleadings that Defendants conspired to manipulate natural gas prices through devices such as intentionally engaging in prearranged wash trades involving roughly the same price and volume, and intentionally engaging in churning designed to create a false impression of supply and demand, such conduct is prohibited under the CEA. As with false price reporting, intent and agreement are matters well within the province of antitrust courts.
The allegations in the present Complaints do not raise the unusually serious legal line-drawing problems that were present in Credit Suisse. In that case, the defendants were underwriters who joined together in syndicates to market shares in initial public offerings ("IPOs") of new companies. Credit Suisse, 551 U.S. at 268, 127 S.Ct. 2383. To set appropriate share prices and quantities, the syndicates had to engage in activities to determine investor interest, including asking investors how their interest may vary depending on share price and quantity, as well as determining which investors might buy shares, at what price and in what quantity, and how long the investor may hold the shares. Id. at 268-69, 127 S.Ct. 2383. Although the syndicates' activities were considered "essential to the successful marketing of an IPO," the Securities and Exchange Commission ("SEC") forbade the syndicates from engaging in closely related conduct. Id. at 276, 279-80, 127 S.Ct. 2383.
For example, the SEC prohibited underwriters from "solicit[ing] customers prior to the completion of the distribution regarding whether and at what price and in what quantity they intend to place immediate aftermarket orders for IPO stock." Id. at 279, 127 S.Ct. 2383 (quotation omitted). However, the SEC allowed and encouraged underwriters gauging customer interest in an IPO to ask a customer about the customer's "desired future position in the longer term (for example, three to six months), and the price or prices at which the customer might accumulate that position without reference to immediate after-market activity." Id. (quotation omitted). The Supreme Court concluded it would "be difficult for someone who is not familiar with accepted syndicate practices to determine with confidence whether an underwriter has insisted that an investor buy more shares in the immediate after-market (forbidden), or has simply allocated more shares to an investor willing to purchase additional shares of that issue in the long run (permitted)." Id. at 280, 127 S.Ct. 2383.
The Supreme Court found similar line-drawing problems with respect to underwriter commissions. Id. The SEC prohibited underwriters from "demanding ... an offer from their customers of any payment or other consideration [such as the purchase of a different security] in addition to the security's stated consideration." Id. (quotation omitted). But the SEC permitted underwriters to "allocat[e] IPO shares to a customer because the customer has separately retained the firm for other services, when the customer has not paid excessive compensation in relation to those services." Id. (quotation omitted). Again, the Supreme Court questioned whether a layperson could distinguish between permissible conduct and impermissible conduct. Id. Moreover, with respect to both types of activities, the Supreme Court questioned whether anyone but a securities expert could predict whether the SEC would change its view as to which conduct was permissible and which was not. Id. at 280-81, 127 S.Ct. 2383.
Here, Defendants are independent natural gas companies who, unlike the syndicates in Credit Suisse, need not form a joint enterprise to ensure the successful *1182 trading of natural gas or natural gas futures. Although price reporting is encouraged, the CFTC has not crafted fine rules delineating permissible price reporting from impermissible price reporting that would require a commodities expert to discern the lawful from the unlawful. Moreover, unlike in Credit Suisse, there is no possibility that the CFTC will change its view that intentional price manipulation is unlawful given the statute's prohibition on any price manipulation or attempted price manipulation. Plaintiffs allege Defendants' false price reports, wash trades, and churning were done with the intent to manipulate the markets, and a jury is equally equipped to evaluate credibility and make determinations regarding intent as the CFTC. Consequently, no unusually serious legal line-drawing problem raises a conflict between the CEA, the antitrust laws, and the specific conduct alleged in these Complaints.
With respect to the degree to which an enforcement-related need for antitrust lawsuits exists, as alleged in the Complaints, the CFTC has engaged in active enforcement of the CEA's price manipulation prohibitions. Additionally, the Complaints allege criminal enforcement against various employees of Defendants and others in the natural gas industry who allegedly engaged in price manipulation. However, neither the CFTC enforcement actions nor the criminal prosecutions addressed the antitrust concerns raised in Plaintiffs' Complaints, nor provided any redress for competitive harms. The CFTC enforcement actions were directed at each company's individual conduct, even when the CFTC alleged collusive pre-arranged wash trades. (Defs.' Request for Judicial Notice (Doc. # 1360-3).) The CFTC also levied substantial penalties, but so far as the record before this Court shows, it never ordered restitution to market participants suffering competitive harm from the alleged manipulations. (Id.) Likewise, the pleadings refer to prosecutions and/or guilty pleas aimed at a particular individual's criminal conduct or intra-company conspiracies, rather than an industry-wide conspiracy as Plaintiffs allege, even though some of the criminal actions referred to unnamed co-conspirators.[6] (Arandell Compl. at ¶¶ 22-23, 36, 41, 46-47, 58; Consol. Compl. 170, 172-73, 179-80.)
The CEA requires the CFTC to take into account competitive considerations when creating its rules and regulations. 7 U.S.C. § 19(b). Further, the CEA contains express causes of action for violations of the Act. 7 U.S.C. § 25. However, persons such as Plaintiffs would have no standing to pursue a claim under the CEA for Defendants' alleged anti-competitive price manipulations on the market as a whole. The private causes of action under § 25 are limited to persons who received trading advice from the violator for a fee, who made a contract for the sale of a commodity for future delivery through the violator, or who purchased from or sold to the violator certain options or contracts. 7 U.S.C. § 25(1).[7] Plaintiffs allege harm resulting from purchases of natural gas in a manipulated market due to Defendants' price manipulations arising from an antitrust conspiracy. While § 25's remedies are the exclusive remedies available under the Act, the Act does not preclude resort to other applicable law, such as the antitrust laws.[8]Id. § 25(2)("the rights of action *1183 authorized by this subsection ... shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter"); Am. Agric. Movement, Inc., 977 F.2d at 1154-55.
The enforcement-related need for antitrust lawsuits is not so "unusually small" as to favor implied antitrust immunity. Credit Suisse, 551 U.S. at 283, 127 S.Ct. 2383. More importantly, the existence of other enforcement mechanisms does not make implied antitrust immunity necessary to make the CEA work. With respect to the specific conduct alleged in Plaintiffs' Complaints, a finding that Defendants entered into a price manipulation conspiracy and thereafter intentionally engaged in various manipulative practices to affect the price of natural gas would not upset or conflict with the CEA enforcement scheme. Rather, permitting an antitrust action based on price manipulation in the commodities markets compliments, rather than conflicts with, the CEA. As stated by the United States Court of Appeals for the Second Circuit,
There is no built-in balance in the regulatory scheme of the Act that permits a little price manipulation in order to further some other statutory goal. Quite the opposite, price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws. Therefore, application of the latter cannot be said to be repugnant to the purposes of the former.
Strobl v. N.Y. Mercantile Exch., 768 F.2d 22, 27-28 (2d Cir.1985) (rejecting implied antitrust immunity argument where alleged antitrust conduct involved price manipulation); see also Strax, 524 F.Supp. at 940-41 (rejecting a claim that the antitrust laws were impliedly repealed in case involving price manipulation in the silver market).[9]
Rather than find the antitrust laws completely ousted, the Court concludes that given the allegations of intentional price manipulation in Plaintiffs' Complaints, the antitrust laws and the CEA are reconcilable, as both preclude such conduct and no legal line drawing requiring particular regulatory expertise will be required to determine if Defendants conspired to engage in the alleged intentional price manipulations. The Court therefore will deny Defendants' motion for judgment on the pleadings.

IV. CONCLUSION
IT IS THEREFORE ORDERED that Defendants' Motion for Judgment on the Pleadings That All Antitrust Claims are *1184 Barred by the Commodity Exchange Act (Doc. # 1360) is hereby DENIED.
NOTES
[1] See also S. Rep. 93-1131 (1974), as reprinted in 1974 U.S.C.C.A.N. 5843, 5863 ("the Committee did not want to exempt the futures industry from the antitrust laws...."); 120 Cong. Rec. 30459 (daily ed. Sept. 9, 1974) ("In establishing this Commission, it is the committee's intent to give it exclusive jurisdiction over those areas delineated in the act.... However, it is not the intent of the committee to exempt persons in the futures trading industry from existing laws or regulations such as the antitrust laws....").
[2] After Merrill, Congress amended the CEA to include an express private right of action. 7 U.S.C. § 25.
[3] The parties are content to use the Amended Complaint in the Arandell action and the Second Amended Consolidated Class Action Complaint in the Abelman Art Glass, Fairhaven Power Company, and Utility Savings and Refund Services, LLP actions as representative examples of Plaintiffs' Complaints in the various actions. The Court therefore will do the same.
[4] Plaintiffs argue the CEA does not govern their physical purchases of natural gas. However, it is undisputed the CEA applies to Defendants' alleged conduct which forms the basis of Plaintiffs' Complaints.
[5] Defs.' Reply P. & A. in Support of Mot. for J. on the Pleadings That All Antitrust Claims are Barred by the Commodity Exch. Act (Doc. # 1433) at 9-10.
[6] Defendants likely would contend this is because no such conspiracy existed, but the Court must accept the pleadings as true at this stage of the proceedings.
[7] Section 25's private right of action against a registered entity, such as an exchange, is not relevant here.
[8] Defendants' argument that permitting resort to the antitrust laws circumvents the CEA's limited remedies is unpersuasive. Congress has erected procedural hurdles that must be overcome to file certain securities claims such that permitting other actions to proceed would circumvent Congress's intent. See Credit Suisse, 551 U.S. at 284, 127 S.Ct. 2383. However, Defendants point to no similar congressionally-mandated procedural requirements on persons seeking recovery under the CEA which would be circumvented by permitting resort to the antitrust laws.
[9] Other courts have reached a similar conclusion in attempting to determine whether the CEA preempts state antitrust laws. See Gold-schmidt v. Hunt, 556 F.Supp. 123, 123 (N.D.Tex.1983) (following on Strax and holding the CEA does not preempt antitrust claims); Strax, 524 F.Supp. at 941 (also rejecting argument that CEA preempted state antitrust laws). While not the same analysis as implied antitrust immunity, the doctrine of conflict preemption involves related considerations, such as whether "compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives." Whistler Investments, Inc. v. Depository Trust & Clearing Corp., 539 F.3d 1159, 1164 (9th Cir.2008).